305 F.2d 444
 S. K. JENSEN and Ethel B. Jensen
v.
The UNITED STATES.
Opal L. JONES, Executrix of the Estate of Carrie Carlton, a/k/a Catherine Carlton; Franklin S. Carlton, Opal L. Jones; Mona Marie Eyestone; and Vann V. Jones
v.
The UNITED STATES.
Walter R. BURDGE and Winston S. Wheeler, Co-Trustees
v.
The UNITED STATES.
Walter R. BURDGE and Winston S. Wheeler, Co-Trustees
v.
The UNITED STATES.
C. A. McCLAUGHRY and Edith M. McClaughry
v.
The UNITED STATES.
 No. 52-58.
 No. 53-58.
 No. 58-58.
 No. 66-58.
 United States Court of Claims.
 July 18, 1962.
 
 George B. Powers, Wichita, Kan., for plaintiffs. Foulston, Siefkin, Schoeppel, Bartlett & Powers, Wichita, Kan., were on the briefs.
 Herbert Pittle, Washington, D. C., with whom was Ramsey Clark, Asst. Atty. Gen., for defendant.
 DAVIS, Judge.
 
 
 1
 These four related cases, tried as one, in which the plaintiffs sue for just compensation for the taking of avigation easements over their properties require us to decide (a) whether the plaintiffs' claims are barred by limitations as having accrued more than six years before the filing of the petitions, and (b) if not, what is the diminution in value attributable to the taking. The Government does not deny that a taking occurred and implicitly concedes that if the limitations defense is rejected it is proper for us to hold that there was a compensable taking within the limitations period (except for one area). The plaintiffs own six tracts immediately to the south of the two north-south runways of McConnell Air Force Base, outside of Wichita, Kansas. These properties are and have been farm lands;[1] three contain farm improvements, while the others do not.
 
 
 2
 The main facts pertinent to the time when plaintiffs' cause of action accrued are these: The Wichita Municipal Airport formerly occupied the land which became the McConnell Air Force Base. Large numbers of commercial, private, and military propeller planes were using the Airport, and beginning in 1950 it was also used for testing by the adjacent Wichita Boeing Airplane Company. Shortly after July 1950, the Air Force decided to locate a base at Wichita to train combat-ready crews to fly the B-47, a 6-engine jet bomber with a wingspan of 116 feet and a length of 109.8 feet. The Wichita Airport was selected because of its proximity to Boeing, which began in 1950 to produce the B-47 for the Air Force. Accordingly, the Airport was acquired by the Federal Government in June 1951 and the new air training base (McConnell Air Force Base) was activated at that time. Commercial planes were allowed to continue to use the facilities of the field until 1954, when all civilian traffic was terminated and transferred to the new Wichita Municipal airport which had been constructed in the meantime.[2] The Air Force began gradually to occupy the Base in 1951-1952, moving into the administration building in April 1952. McConnell became the world's first B-47 base and it has continued as an important center for jet bombers. The larger 8-engine B-52 jets, also produced by Boeing, began to come onto the field in the spring of 1956.
 
 
 3
 In December 1950, Boeing delivered the first B-47 to the Air Force at the then Municipal Airport. By June 1951, when the Air Force Base was opened, only 11 B-47's had been delivered; of these the Air Force retained no more than 8 at the Base. By the end of 1951 a total of 60 had been delivered, but as yet very few were assigned to McConnell. In 1952, 300 more B-47's came from Boeing but the total at the Base increased to only 17. During this time (late 1950-early 1953), the B-47's stationed at McConnell were used primarily for long-distance training flights which were isolated and infrequent events; however, there were also a substantial number of flights testing new planes as they came from the Boeing plant.[3] For most of the rest of 1953, B-47 flight operations were transferred elsewhere to permit completion of a new runway at McConnell; training and testing operations continued and the training work increased in intensity in the latter part of the year. Beginning in December 1953 (after the two runways could be used), and particularly during the early months of 1954, the flights of B-47's were very frequent and they became the predominant aircraft using the runways — in December 1953 the Air Force began regularly to maintain about 90 B-47's at McConnell — particularly after April 1, 1954, when civilian use of the Base ended. The monthly average of take-offs and landings was about 20,000. By May 1958, there was an average of 700 flights cleared daily over the usual 5-day week; this was an average of a take-off or landing every two minutes on the north-south runways (which alone affected plaintiffs' property).
 
 
 4
 Over the years, these north-south runways have been developed to meet the increasing needs of the field. Prior to 1950 the single north-south runway was 8,000 feet long; in 1950 Boeing extended it (to the south) to 10,000 feet; in 1951 the Air Force lengthened it (again to the south) to 12,000 feet. In 1953 a second, parallel, north-south runway was built, also 12,000 feet in length. The B-47's use the north-south runways exclusively, except for emergencies.
 
 
 5
 Plaintiffs' lands are located (except for Wheeler tract #3) within the approach zone to the southern end of these north-south runways.[4] In taking off (but not in landing) to the south, the planes pass over these lands. The normal heights of a B-47 taking off over the Jensen land vary from about 100 feet to as high as 500 feet, the mean altitude being about 200 feet at the north edge and 300 feet at the south edge. For the Jones property the variation is from 200 feet on the north edge to 1,000 feet on the southern line, with the mean altitude being 300 feet on the north and about 500 feet on the south. The variation for the McClaughry tract and the adjacent Wheeler tract #1 is the same, except that the mean altitudes are 400 feet on the north and 500 feet on the south. The mean altitude for Wheeler tract #2 is 500 feet on the north and 600 feet on the south. For Wheeler tract #3 the altitude on take-offs varies from 500 to above 1,000 feet, and is generally more than 700 feet. Except for this last property (Wheeler tract #3), the relatively few landings passing over plaintiffs' lands[5] are substantially lower than on taking off.
 
 
 6
 It is clear from these facts and from the Trial Commissioner's detailed findings, which we adopt, that — putting Wheeler tract #3 to one side — the flights of B-47's from and to the McConnell base have directly and immediately interfered with the use and enjoyment of plaintiffs' properties. The intensity of the noise, as well as the frequency and low level of the flights by these big planes, are comparable to those elements in our earlier decisions involving jet aircraft;[6] in addition, there was proof of the annoying use of floodlights (as to some of the tracts), a pall of black smoke over the area, and the rather frequent falling of dangerous objects.
 
 
 7
 The first disputed question is when did this interference become so serious that a taking occurred and a cause of action arose. The defendant claims that the taking occurred before February 1952 and therefore that these suits, filed in February 1958, are out of time. The plaintiffs, on the other hand, urge that no taking at all took place until 1953. We have concluded that there was no taking prior to the limitations period (Feb. 1952 to Feb. 1958), and therefore we are not required to decide in this case the application of the statute of limitations, or the proper measure of recovery, in the situation where a taking of an avigation easement occurs prior to six years but there is another such taking, or a grave intensification of the initial interference, within the six-year span before suit. Compare Klein v. United States, No. 157-58, decided Jan. 18, 1961, and Davis v. United States, Ct.Cl., 295 F.2d 931.
 
 
 8
 There is, unfortunately, no simple litmus test for discovering in all cases when an avigation easement is first taken by overflights. Some annoyance must be borne without compensation (United States v. Causby, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206; Allegheny Airlines v. Village of Cedarhurst, 238 F. 2d 812, 815-816 (C.A. 2)). The point when that stage is passed depends on a particularized judgment evaluating such factors as the frequency and level of the flights; the type of planes; the accompanying effects, such as noise or falling objects; the uses of the property; the effect on values; the reasonable reactions of the humans below; and the impact upon animals and vegetable life. The Government's argument that the taking in this case occurred before February 1952 (i. e., prior to six years before the filing of the petitions) fails because it overstresses some of these elements and neglects others which are critical.
 
 
 9
 The gist of the defense is that plaintiffs' properties must have been seriously affected and reduced in value during 1950-1951 (a) by the very large number of take-offs and landings in that period by aircraft of various kinds, including military planes, as well as (b) by the number of test and operational flights of B-47's, in particular, which were made in 1950-1951. The first factor — the large total of all take-offs and landings (see footnote 2, supra) — is not at all persuasive. By far the major share was by propeller planes (many of them light craft) which have been recognized as normally causing less serious interference than large jets (although in proper circumstances propeller flights, too, can result in a taking). Our cases document this general proposition.[7] There is also an insufficient showing on this record of the proportion of these planes from the Air Base which passed over the plaintiffs' lands, the altitudes at which they flew, or the frequency of their passage. Moreover, we have the plaintiffs' flat disavowal that these earlier flights in 1950, 1951, and early 1952 caused any serious interference or diminution in value. Plaintiffs' position cannot be accepted as conclusive (since their interest is to advance the date of taking beyond February 1952), but it is consistent with the known objective facts and must be given considerable weight, particularly in the absence of adequate countervailing proof that there was actually a greater effect from these flights than plaintiffs admit.
 
 
 10
 Similarly, we do not infer from this record that a taking occurred as a result of the test and operational flights of B-47's in 1950, 1951, and early 1952 (see footnote 3, supra). At that time the tests of new aircraft were relatively infrequent, about two a day.[8] The number of B-47's actually stationed at the Base was likewise small, and their flights isolated and infrequent. McConnell Air Force Base, as a whole, was still in the process of creation and construction; the new north-south runway was not built until 1953. The plaintiffs assert, too, that these earlier B-47 flights did not affect the value or use of their properties, and this concession is understandable when one compares the intensity of the B-47 activity beginning after the spring and summer of 1952 with the rudimentary operations of the prior period. Unless there has been significant depreciation in value or enjoyment of a property, this court has not considered the mere advent of jet aircraft as the signal of a taking. See, e. g., Bacon v. United States, Ct. Cl., 1961, 295 F.2d 936; Wilson v. United States, No. 114-57, decided Nov. 2, 1960.
 
 
 11
 The taking did occur, we hold, sometime after the first quarter of 1952; and, accordingly, the plaintiffs' claims are not barred by limitations. It is somewhat difficult to select a more precise time, but we are required to do so for the purposes of valuation and the computation of the amounts payable for delay in payment (commonly called interest). The Trial Commissioner has determined that — except for Wheeler tract #3, the land farthest removed from the runways — the frequent flights of B-47's "over a period of about a year from the latter part of 1952" caused a reduction in the value of the properties which occurred "between the latter part of 1952 and the latter part of 1953" (findings 38, 41). On a review of the evidence, we accept the finding that both the taking and the depreciation occurred over a year's time, and, because there is no more appropriate date within that period, we choose January 1, 1953, as the day from which delay-payments are to be computed, so as to assure the plaintiffs of full compensation for the monies they should have had, in theory, as soon as the reductions in value occurred
 
 
 12
 The remaining issue concerns the amounts to which plaintiffs are entitled for the taking. The Commissioner has found that prior thereto the highest and best use of the lands was (in the main) agricultural, not residential, and he has evaluated the loss on that basis — it being agreed that after the taking the lands had no more than agricultural value. Plaintiffs insist that were it not for these overflights of B-47's in 1952 and 1953 their property would have been ripe for residential development, and therefore that it was worth considerably more than agricultural land. We agree, however, with the Commissioner and adopt his findings which are appropriately grounded (with a permissible shift in the time of valuation) in the more solid evidence of an appraiser who evaluated the sales of comparable property in the vicinity, took account of the location of and the facilities available to plaintiffs' land, and recognized the unlikelihood of a new residential development springing up so close to the north-south runways of the airfield. Plaintiffs (and their appraisers) give insufficient weight to the cardinal fact that, prior to the taking by the B-47 flights in 1952 and 1953, the properties were adjacent to the busy activity of, at first, the Municipal Airport and, later, the Air Force Base. In all likelihood, even before the jet flights began to interfere directly with the use and enjoyment of plaintiffs' agricultural land (and thus to take the easement for which compensation is sought), the nearness of this large air-field and its potentiality of growth had already acted to blight any bud of residential value.[9] Such an earlier diminution-in-value or check on further development and growth, linked to the existence of the airport and its manifold activities (including previous overflights which did not impose a servitude), cannot be attributed to the later taking. That prior loss, if such it be, was one for which the United States is not responsible — just as the United States could not avoid paying for a prior independent gain in value. Cf. United States v. Miller, 317 U.S. 369, 376-377, 63 S.Ct. 276, 87 L.Ed. 336; United States v. Cors, 337 U.S. 325, 332-333, 69 S.Ct. 1086, 93 L.Ed. 1392; United States v. Virginia Electric & Power Co., 365 U.S. 624, 633-636, 81 S.Ct. 784, 5 L.Ed.2d 838.
 
 
 13
 For these reasons, we accept the Commissioner's findings as to the pre-taking value of the six tracts[10] and the depreciation due to the B-47 flights. The latter amounts plus a sum to compensate for delay in payment constitute just compensation for the perpetual easements taken by the defendant. Since there was no change in the value of the Wheeler tract #3 — the most outlying of the areas and the only one over which the flights passed at an average altitude of more than 500 feet — we are not required to decide whether the United States, as taker, can be held liable for overflights above the 500-foot ceiling fixed by the Civil Aeronautics Board. See Matson v. United States, 171 F.Supp. 283, 145 Ct. Cl. 225, 229; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206.
 
 
 14
 Judgment will be awarded to the plaintiffs in No. 52-58 for $10,000; to the plaintiffs in No. 53-58 for $19,000;[11] to the plaintiffs in No. 58-58 for $13,000; and to the plaintiffs in No. 66-58 for $4,700. In each case, there will be added a sum computed at 4 per cent per annum from January 1, 1953, to date of payment, to compensate for delay in payment, as part of just compensation. The respective plaintiffs (or other appropriate persons empowered to do so) will execute deeds conveying to the defendant a perpetual easement of flight for airplanes of any kind[12] over any part of the respective plaintiffs' properties (except Wheeler tract #3) at and above the following altitudes: 100 feet in No. 52-58; 100 feet in No. 53-58; 200 feet in No. 58-58 for Wheeler tracts #1 and 2; and 200 feet in No. 66-58.[13]
 
 
 15
 It is so ordered.
 
 
 16
 JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.
 
 
 
 Notes:
 
 
 [1]
 We shall refer to the tract in Case No. 52-58 as the Jensen land; to the tracts in Case No. 53-58 as the Jones land; to those in Case No. 58-58 as the Wheeler tracts #s 1, 2, and 3, and to that in Case No. 66-58 as the McClaughry land
 
 
 [2]
 Finding 15 indicates the total landings and take-offs (military, airlines, and other civil flights — all types of planes) from all runways at the field for the years 1949-1953, and finding 16 gives the monthly totals for most months. In 1949 there were a total of 157,939 flights (of which 22,422 were military). In 1950 the total was 111,963 (of which 23,799 were military). The number in 1951 was 155,537 (74,855 military); in 1952 it was 249,084 (177,196 military); and in 1953 it was 245,652 (182,253 military)
 
 
 [3]
 In the four months from September 1950 through December 1950, a total of 135 B-47 flights were made at the field by Boeing or the Air Force in preacceptance or acceptance tests. In 1951 there were 700 such testing flights. In 1952 the number increased to over 2,100 and in 1953 the level was comparably high
 
 
 [4]
 The Jensen tract immediately adjoins the southern boundary of the Base and is about 1,500 feet from the south end of the extended runways; next to the south is the northern part of the Jones property; the small McClaughry tract abuts the southern edge of the north portion of the Jones property; to the south come the other part of the Jones land and the first two Wheeler tracts; Wheeler tract #3 is separate land somewhat to the southeast
 
 
 [5]
 These are landings to the north, which are only 30% of all landings. Of the takeoffs and landings involving the north-south runways, 70% are to the south
 
 
 [6]
 Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269, 270-271; Adaman Mutual Water Co. v. United States, 181 F.Supp. 658, 143 Ct. Cl. 921, 923-925; Dick v. United States, 144 Ct.Cl. 424, 426-427; Matson v. United States, 171 F.Supp. 283, 145 Ct. Cl. 225, 226-227; Wright v. United States, 1960, Ct.Cl., 279 F.2d 517, 519; Davis v. United States, 1961, Ct.Cl., 295 F.2d 931, 932-933; Bacon v. United States, 1961, Ct.Cl., 295 F.2d 936, 937-938; Klein v. United States, No. 157-58, decided Jan. 18, 1961; Wilson v. United States, No. 114-57, decided Nov. 2, 1960, slip op. pp. 5-7. See also Griggs v. County of Allegheny, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585
 
 
 [7]
 See Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269, 270; Adaman Mutual Water Co. v. United States, 181 F.Supp. 658, 143 Ct. Cl. 921, 923; Bacon v. United States, 1961, Ct.Cl., 295 F.2d 936-937
 
 
 [8]
 There were 700 test flights in 1951. Since 70% of the take-offs and landings from the Base were made to the south, some 490 of the take-offs probably passed over plaintiffs' property in the course of that year. Only 30% of the landings (those to the north) involved plaintiffs' lands; these amounted to some 210 in the year. The total of these takeoffs and landings adds up to an average of some two circuits a day. These figures should be compared with the later monthly average (after April 1954) of 20,000 take-offs and landings by B-47's, and the daily average (by May 1958) of 700 flights
 
 
 [9]
 It is significant that there was no residential development in the general area south of the airport for quite some distance
 
 
 [10]
 Findings 40 and 41 merge Wheeler tracts #1 and 2 and call them "Burdge, Wheeler, north tract." Wheeler tract #3 is denominated the "Burdge, Wheeler, south tract."
 
 
 [11]
 In their briefs plaintiffs ask for a special detailed division of the judgment in No. 53-58. Since the petition does not pray for judgment in that fashion, we leave the exact form of the payments to the parties
 In No. 66-58, the petition incorrectly denominates Mrs. McClaughry as "Ethel". Her correct name is "Edith" and the petition is amended accordingly.
 
 
 [12]
 We are directing that the deeds convey an easement of flight for airplanes of any kind because of the particular facts and circumstances of these particular cases
 
 
 [13]
 These altitudes take account of the level of flights over plaintiff's properties in the course of landings as well as in take-offs. See finding 29