**Michael CARCHIA, Jr., Receiver for Dorchester Equipment Co., Inc., and the Aetna Casualty and Surety Company, Intervenor,**

v.

**The UNITED STATES.**

**No. 242–67.**

United States Court of Claims.

Oct. 17, 1973.

Francis V. Matera, Boston, Mass., attorney of record, for plaintiff John W. Di Nicola and McCormack, Elcock, Cohen & Matera, Boston, Mass., of counsel.

Edward O. Proctor, Boston, Mass., attorney of record, for intervenor The Aetna Casualty and Surety Co., Ely, Bartlett, Brown & Proctor, Boston, Mass., of counsel.

Paul A. Zoss, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

DAVIS, Judge.

This is a contract case, brought by the plaintiff, receiver for Dorchester Equipment Co., Inc. (the company is sometimes called plaintiff), for breach of a construction contract between that firm and the United States, acting through the Post Office Department. The contract was in lump-sum form, subject to adjustment for unit prices for piling, pre-drilling for piling, and other such items. The price arrived at by competitive bidding was $265,000. The award was made on July 19, 1961, by the Post Office Department, Bureau of Facilities, Division of Real Estate. The work required the contractor to furnish all labor equipment and materials and perform work for demolition, removal of railroad trackage, canopies, etc., necessary to construct footings for a future canopy at Terminal Annex, South Postal Annex, United States Post Office, Boston, Massachusetts. The plans and specifications had been prepared by Pedersen and Tilney, architects of Boston. The work was to commence as soon as possible after receipt of notice to proceed and was to be completed in 150 calendar days after receipt of that notice. The completion date thus computed became December 27, 1961.

The plaintiff makes claim on account of extra work necessitated by changed conditions, for costs incurred by reason of unreasonable delays to the work, and for damages resulting from the alleged wrongful termination of the contract.

The intervenor, the Aetna Casualty and Surety Company, became the surety on the performance and payment bonds. By motion to intervene on the ground that representation of its interest is or may be inadequate, that it may be bound by the judgment, and that it has a pecuniary interest in the subject matter of the action, the intervenor has been permitted to be added as a party to this litigation and has participated in the proceedings. By arrangement with the Government, the surety completed the contract work.

The defendant filed a counterclaim against the plaintiff covering certain architect-engineer expenses and other expenses by reason of alleged defective work, in the sum of $5,739. The defendant also filed a contingent counterclaim against the intervenor for sums which the court might find were paid by the defendant to Aetna, but which should have been paid to the Dorchester Equipment Company. It originally asked judgment, also, over against Aetna for any amount awarded to the plaintiff, but that claim is no longer pursued.

The contractor's claims were the subject of an appeal to the Post Office Board of Contract Appeals which, after extended hearings, found that the "termination for default was premature", and remanded the matter to the contracting officer for settlement of the amount due Dorchester. When the parties were unable to agree on a settlement, additional hearings were held and a subsequent decision was entered which allowed the plaintiff $20,725.47 for extra work but held that the Board was without jurisdiction to determine liability for delay claims or standby time or the claim relating to termination for default. There is no evidence that the $20,725.47 was ever paid to the plaintiff or Dorchester Equipment. In this court, the parties agreed to a trial *de novo* which has been held.

As a result of the trial, the trial judge determined: "On the basis of the entire record it is concluded that the termination for default was improper and unwarranted and a breach of the contract since a great deal of the delay which was charged to the plaintiff was actually the fault of the defendant through its architect and in turn through its architect's subcontractor. Additional causes of delay are clearly not chargeable to the contractor since they were due to the encountering of a great many underground obstructions which interfered with the orderly progress of the work by not only the contractor but its pile-driving subcontractor. For such breach of contract the defendant must respond in damages for the breach."[1] Defendant does not challenge these conclusions, nor does it contest that the contractor performed additional work for which it should be compensated. It is therefore unnecessary to recite the facts showing that the trial judge is correct. (His findings on these points, which we adopt, present sufficient detail.) The issues which remain to be decided concern the amounts of recovery by the plaintiff (Part I, *infra*) and by the surety (Part II, *infra*),

and the disposition of the Government's counterclaims (Part III, *infra*).

I

The trial judge found $63,602.30 now owing by defendant to plaintiff. The Government contests only one item (*i. e.* anticipated profits), but plaintiff asks us to add several additional sums. We reject all of these exceptions and confirm the amount arrived at by the trial judge.

A. Since this was an old-style contract which did not provide that a wrongful default termination was to be considered a convenience-termination, plaintiff was entitled to anticipated profits for work not yet performed at the time it received the improper notice of default termination. *See* General Builders Supply Co. v. United States, 409 F.2d 246, 251, 187 Ct.Cl. 477, 485–486 (1969); J. D. Hedin Constr. Co. v. United States, 408 F.2d 424, 431–432, 187 Ct.Cl. 45, 58–59 (1969). The trial judge assessed this at $28,042.70, a sum derived from the costs incurred and the profit made by the company which completed the work on behalf of the surety. The Government argues that it was error to use that firm's profit-and-costs as a measure, and that the correct gauge of anticipated profits would take into account the relationship of the amount of work left undone by Dorchester Equipment to the contract's original fixed price. The latter amount was $265,000, and under our findings Dorchester performed $152,000 of this work, leaving $113,000 worth still to be performed; defendant would grant plaintiff 10% of this sum ($11,300) in anticipated profits.

We hold that the trier's method was acceptable. If Dorchester had not been wrongly terminated, it would have completed the contract and probably done the same work and incurred the same costs (including a very considerable amount of extras) as the company which

---

1. The contract did not contain a convenience-termination article.

actually finished the job. The completing firm's profit is therefore a reasonable basis for the award to plaintiff of the gain it lost through the Government's wrongful ending of the contract. As we point out below (Part II, B, *infra*), the completing firm's actual costs and outlays must be taken on this record as reasonable—and it is not far-fetched to infer that Dorchester would have had equivalent expenses and done about the same amount of work.

■ B. 1. In his brief, plaintiff specifies a number of work items, omitted by the trial judge, for which he says Dorchester should be further compensated.[2] We agree with defendant that, as to one instance, the trial judge did in fact cover the item and allow compensation, and, as to the others, plaintiff has made insufficient proof that it incurred the costs now claimed. On these items, there is plainly insufficient reason to overturn the trial judge's considered denial of compensation. *Cf.* Davis v. United States, 164 Ct.Cl. 612, 616–617 (1964).

■ 2. A more important controversy concerns an unpaid judgment plaintiff says was obtained against Dorchester by Raymond International, Inc., the subcontractor for the foundation and pile-driving work.

It is agreed by everyone that the surety and Dorchester were made defendants in a Miller Act suit brought by Raymond in the United States District Court for the District of Massachusetts, covering the pile-driving work that firm had performed for the plaintiff, extra work required in the performance, as well as delay it encountered. A settlement was effected under which judgment was entered against the surety for $60,500, which has been paid, and judgment over was also entered in favor of

the surety against Dorchester and its officers individually for the same amount (which has not been paid). The trial judge included this $60,500 in the surety's damages recoverable from defendant (see Part II, D, *infra*).

Plaintiff claims that there was another judgment (for $61,546.78), in another litigation, obtained by Raymond against Dorchester, which is still outstanding and unpaid. This second judgment, we are informed, was entered on Raymond's affidavit that it had expended this additional amount and on Dorchester's failure to respond.[3] The trial judge, plaintiff insists, simply overlooked this extra judgment and therefore deprived plaintiff of a large sum in damages.

Defendant urges strenuously that plaintiff never made proper proof of this alleged judgment, and that it was for that reason that the trier took no account of it. The only relevant document accepted in evidence, before proof was closed, was a copy of an execution form referring to this judgment; no copy, let alone a certified copy, of the judgment itself was introduced. Defendant specifically objected, before the trial judge, that there was no record evidence of this second judgment.

In its exceptions to the trial judge's opinion and findings, plaintiff reproduces a copy of a "judgment on counterclaim" entered by the District Court for $61,546.78, as well as Raymond's affidavit (in support of its motion for summary judgment) on which that judgment was based. Defendant has moved to strike those documents as not properly put in evidence—at the appropriate time —and therefore not to be considered by the court.

■ It is plain to us that plaintiff did not make adequate proof, at the correct time, of this judgment of Raymond

---

2. These are characterized as work performed under the contract division of work after October 15, 1961, but not included in pay estimate No. 3; testing engineering services; extra work in removing unsuitable material below design guide; change in pile cap eleva-

tions along line A; delays from November 13, 1961 to March 19, 1962.

3. Plaintiff claims, in short, that Dorchester was indebted to Raymond in a total of $122,046.78 ($60,500+$61,546.78), of which only $60,500 has been paid.

against Dorchester, and that it is impermissible for plaintiff now to bolster its defective case by presenting exhibits to us which it failed to offer properly before the trial judge. The case should have been tried according to the established procedures, and there is no excuse for the belated post-trial effort to shore up an evident gap in plaintiff's evidence.[4] The trial judge undoubtedly considered that there had been a total failure of proof on this point, and we agree.[5]

There is, moreover, another defect in plaintiff's reliance on this judgment. Since the United States is not bound by the litigation and the judgment to which it was not a party, plaintiff could recover this amount from the Government only if there were good reason to believe that this proceeding with Raymond was *bona fide* and the alleged judgment actually represented costs for which plaintiff was properly liable to Raymond. *Cf.* Acme Process Equipment Co. v. United States, 347 F.2d 509, 535–536, 171 Ct.Cl. 324, 368–369 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). There are serious doubts on both scores. One difficulty is that, although the judgment in the earlier suit involving Raymond, the surety and Dorchester (resulting in the settlement for Raymond for $60,500) could probably have been argued to estop Raymond collaterally from claiming an additional recovery, or to release Dorchester from paying Raymond any further sums, those defenses were apparently not presented. And, moreover,

judgment was allowed to be entered, in effect by default, simply on Raymond's affidavit of additional costs (above the $60,500 granted in the other judgment), which affidavit is conclusory, not specific, and far from persuasive.[6] As we point out immediately below, the proof in the present litigation does not support this extra $61,546.78 as representing work actually performed by Raymond.

3. Aside from the demand that he be reimbursed for this $61,546.78 judgment, plaintiff maintains that, in any event, Dorchester's recovery with respect to the work done by Raymond should be calculated, not according to the value of the work the latter did, but rather on the basis of the prices Dorchester "charged" defendant in the prime fixed-price contract. The findings are that Raymond actually performed $52,000 worth of work (according to its invoices), and that defendant has paid Dorchester $22,130 for this work. Some of the unchallenged items for additional work (which we are awarding) may also represent work done by Raymond. Plaintiff now demands a very large further sum (almost $84,000), but the short answers are that (i) this inflated figure includes the unproved "extras" which Raymond stated so summarily in its affidavit in the District Court but which were not proved in the current proceeding, and as to which there is no proper showing of liability by plaintiff to Raymond, and (ii) if Dorchester was entitled to a reasonable profit and overhead on the work done by the subcontractor

4. In view of our disposition of this issue, it is unnecessary to grant defendant's motion to strike. That request becomes moot.

5. Before the trial judge, plaintiff seems to have recognized the weakness of his proof. In "Plaintiff's Rebuttal to the Defendant's Comments and Objections to the Plaintiff's Proposed Findings of Fact", p. 23, counsel emphasized other evidence (aside from the judgment) to show the sums owing to Dorchester for work done by Raymond, saying that if "Defendant's counsel persists in his objection to the admissibility of the Certificate of Judgment, the Plaintiff will not press the

issue and relies upon the evidence above stated." Since no certificate of judgment was ever offered as to the $61,546.78, this comment may possibly have referred only to the $60,500 judgment by Raymond against the surety, but we take it, in context, as referring to both judgments. (The trial judge did, however, accept the smaller judgment as properly proved, as do we, see Part II, D, *infra*.)

6. So far as we are aware, plaintiff has not moved to set aside this judgment, nor has he given us any valid excuse for failing to contest Raymond's motion for summary judgment.

(over and above the amount already paid out to plaintiff or to be paid under our judgment) plaintiff has utterly failed to prove it. In sum, the present record does not sustain any damages for work done by Raymond greater than those we are allowing.

■ 4. At the oral argument plaintiff changed his position to claim that nothing at all should be paid to the surety but that the whole award—which plaintiff computes at $453,525.36, including a completion cost for the surety of $140,805.30—should go to him, his obligation (he says) then being to pay the two judgments discussed above, as well as the surety.[7] This drastic change of position comes much too late and cannot be considered. The case was tried and presented to the trial judge on a wholly different basis; the briefs and exceptions to his decision and findings were also grounded on that other basis; in particular, plaintiff did not at all object to the making of an award directly to the surety.[8] There is no good excuse for the sudden and extreme modification in the scope of plaintiff's claims. It would be unfair to the other parties and destructive of the requirements of orderly procedure to allow plaintiff, at this late stage, the unearned indulgence he seeks. In any event, we reject on its merits plaintiff's new contention that the surety is not entitled to any judgment. See Part II, A, *infra*.

The result is that the trial judge's award to plaintiff, in the sum of $63,602.30, is sustained against the attacks by both the Government and the plaintiff.

## II

Aetna, the surety, is content with the trial judge's award to it, but the defendant assails the award *in toto*, and also with respect to specific items.

■ A. The surety asks, from the defendant, its costs of completion over and above the contract balance (plus authorized changes). It is this aspect of the award which the Government particularly challenges. Unlike Dale Construction Co. v. United States, 168 Ct.Cl. 692, 733, 847–849 (1964), and William Green Construction Co. v. United States, 477 F.2d 930, 938 n. 10, 201 Ct.Cl. 616, —— n. 10 (1973), there is no allegation or adequate showing in this case that the contractor is liable to the surety for the excess costs of completion (over and above the amount of the contract).[9] The Government's main barrage is, therefore, that the contractor is wholly uninterested and uninvolved in the recovery of these additional sums, and the surety cannot sue here because it has no contract, express or implied, with the United States for the recovery of these amounts.[10]

Whatever may be the rule if the surety had not finished the work by agreement with the United States, that is not the situation here. After the wrongful default termination, the contracting officer called upon Aetna to complete the remainder of the work. Pursuant to a written agreement between the surety

---

7. Under plaintiff's calculation, this would leave him with $191,373.30; this figure includes, of course, the various additional claims which we have held *supra* not to have been proved.

8. The conclusion of plaintiff's "Exceptions and Brief", filed after the trial judge's decision, expressly asked that judgment be awarded plaintiff for $314,393.07 and that the surety be granted $140,805.30.

9. At the oral argument, the surety's counsel pointed to Dorchester's "Application for Contract Bond and Agreement of Indemnity" (fdg. 92) which contains what appears to be a broad indemnity provision, but this provision was not relied upon in the brief and we are quite uncertain whether it covers, or was intended to cover, the excess costs for which the surety now seeks recovery (*i. e.*, a case in which the contractor was wrongfully defaulted by the Government and the surety undertook to complete).

10. At the oral argument, but not previously, plaintiff's counsel joined in this position, see Part I, B, 4, *supra*, drawing the further conclusion (which the defendant does not draw) that the contractor is entitled to these additional sums.

and the contracting officer, based upon that officer's decision that the plaintiff was in default, the balance of the work, including extras, was fully performed by the surety company, through another contractor, by about November 1, 1962. In the performance of the work, the surety expended $280,427.06 and received from the defendant $212,163.80, leaving a difference of $68,263.26.

In the written agreement between the surety and the defendant, Aetna undertook to complete the work (through the Tredennick-Billings Company), and the Government agreed to pay the surety the entire contract balance plus extras (if any).[11] The Government now urges that its obligation was strictly limited to the technical contract balance—not including the excess costs, even if the default turned out to be wrongful—but we think the agreement should not be interpreted so rigidly and literally. Fairness requires a more expansive and equitable reading.

If Aetna had refused defendant's request to complete, and the Post Office Department had had to contract with some other construction firm to finish the work, that company would probably have had to incur the same excess costs as Aetna (and its completing subcontractor Tredennick-Billings), but, though the United States would have to pay those excess costs to the completing firm, it would not be able to recoup the amount either from Dorchester or from Aetna—the termination of Dorchester's contract being wrongful, neither the contractor nor the surety would be liable for the excess costs of reprocurement. The defendant, in short, would have to bear the additional costs itself.

Similarly, if Dorchester, like the contractor in *Dale Construction Co., supra,* had made an indemnity agreement with Aetna, then Dorchester (or the plaintiff-receiver in its stead) could have recovered from the United States the

amount of the surety's excess completion costs (whether or not the surety had a formal take-over agreement with the Government). That is the holding of the *Dale Construction* opinion, and defendant · explicitly disavows any challenge to the rule. In that situation, too, the United States would have to pay the bulk of the excess expenses.

There is no good reason why the United States should be in a better position because, without indemnity from the contractor, the surety undertakes, at government urging, to finish the work under a written take-over agreement. The Government gets the same benefit, and incurs no greater risk or burden, as when it chooses an outside firm to complete, or when the surety completes but with an indemnity obligation from the contractor. Nevertheless, defendant insists that, in this instance, the whole risk must be the surety's; it should not, the Government says, agree to complete unless it is willing to accept the correctness of the default termination as a postulate. But that is not the rule or the requirement if the contractor (as in the *Dale Construction Company* case) makes itself liable to the surety. If the defendant's proposed rule were put into effect, sureties without indemnity agreements would be deterred from undertaking completion jobs since they could be far worse off (if the default termination turned out to be improper, and if excess costs were incurred) than if they allowed the Government to find its own completion contractor. The normal policy is to let sureties finish the job, a policy which ordinarily runs to the mutual advantage of Government and surety and tends to reduce the expenses of completion. The generally-phrased completion agreement in this case should be understood in that light, instead of thrusting the entire risk on the surety and discouraging it from taking over. If the Government wishes the surety to shoulder the entire risk (unless it can

---

11. There was also an explicit provision that the agreement was without prejudice to the Government's claims against Dorchester or the latter's against the Government "arising out of the contract."

obtain an indemnity agreement from the defaulted contractor), the agencies should say so much more specifically in their completion agreements. Both parties will then understand clearly that they stand in very unequal positions and that the Government is insisting on a special status.

We hold, for these reasons, that the Post Office's agreement with Aetna should be read to contain the implicit term that, if the Dorchester termination was later admitted or found to be wrongful and if Aetna reasonably incurred excess costs in completing, the Government would be liable to Aetna under the completion agreement for those additional expenses—just as it would be responsible to an outside completing contractor. In effect, Aetna is to be treated, in those circumstances, as if it were such an independent completer. The United States is therefore liable, under the agreement, for Aetna's reasonable extra costs of completion. With respect to such costs, the agreement will not be construed to leave the defendant scot-free and the surety remediless.[12]

■ B. In any event, defendant urges that the surety has not proved the reasonableness of its completion costs ($280,427.06), as found by the trial judge. There is no doubt that this amount was actually paid by Aetna to Tredennick-Billings. We think that this fact of actual payment, together with the supporting testimony, made enough of a showing that the payments were reasonable to allow the trier to accept them, nothing else appearing, and to throw the burden on the defendant of going further if it suspected the costs were too high. Defendant made no effort to show or to suggest that the costs were in any way out of line or unreasonable.[13]

■ C. The trial judge allowed Aetna certain attorneys' fees which are challenged by defendant. We agree that these disputed fees were unconnected with the performance of the contract, involving rather the protection of the surety's own interests, its claims, and its litigation. Under our decisions they are not recoverable. See, Dale Constr. Co. v. United States, 161 Ct.Cl. 825, 831 (1963); J. E. Robertson Co. v. United States, 437 F.2d 1360, 1364, 194 Ct.Cl. 289, 296–297 (1971); Rash v. United States, 360 F.2d 940, 947, 175 Ct.Cl. 797, 810–811 (1966); L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 177 Ct.Cl. 870, 888 (1966). The same is true for a small travel item of $126.23.

■ D. The trial judge included in the surety's damages the amount of $60,500 recovered by the pile-driving subcontractor (Raymond) against Aetna, and paid by the latter. See Part I, B, 2, supra. Though defendant makes some point that this judgment was insufficiently shown, we think the judge could decide that the proof was adequate in the light of defense counsel's concession on the record of the existence of the judgment. Defendant also cavils that

---

12. To decide this case, we need go no further than to hold that this is so where the Government admits that the default termination was improper or, as here, where a competent tribunal so holds in a proceeding in which the contractor (not the surety alone) makes that contention. We leave open the issue of whether the completing surety can challenge the default termination where the contractor fails to do so.

   In Anderson v. United States, 97 Ct.Cl. 545 (1942), an early case which is comparable on the facts, there was no reliance upon a take-over agreement (if one existed), the surety invoking solely its alleged rights of subrogation. The court's opinion goes off on that ground alone. Dale Construction Co., supra, shows that there is no invariable rule against recovery of the surety's completion costs.

13. This is not a case of disentangling expenses unattributable to the Government from those for which it was responsible (see Boyajian v. United States, 423 F.2d 1231, 1238, 1242, 191 Ct.Cl. 233, 244–245, 252 (1970)). Here, defendant is liable for all completion costs, provided they were reasonably incurred. There is no problem of separating government-caused expenses from others. In the latter circumstances there is a greater need for proof by the claimant that it is not charging the defendant for expenses for which it should not pay.

Aetna has failed affirmatively to sustain the litigation as *bona fide,* but counsel has not challenged the judgment on that score, nor has the Government suggested the slightest reason for doubting the good faith or soundness of the amount awarded. With respect to this particular judgment, we know of no such reason to be wary.

The Government then says that, if the full amount of $60,500 is included in the surety's award, the United States will pay twice for a substantial part of the work done by Raymond. Raymond's work was, of course, under the original contract with Dorchester, which had a basic fixed price of $265,000. The total judgment sum of $60,500 consists of $52,000 for Raymond's efforts plus $8,500 for interest and costs; of this $52,000 the amount of $22,130 was paid by defendant to Dorchester but was never transmitted over to Raymond. *See* Part I, B, 3, *supra.* Defendant now argues that the remaining $29,870 must have already been paid to the surety since the contractor and the surety together have received more than $265,-000.[14]

One significant flaw in this contention is that the initial contract price has plainly been increased in considerable measure by extras and changes (including a substantial part relating to Raymond's work), and we cannot at all assume that the full contract price has yet been paid.[15] By the same token, we cannot say that the surety has yet been paid for any portion of Raymond's work or that if we allow the $60,500 judgment it will receive double payment for the same items. Moreover, the trial judge handled the problem of the $22,130 paid by the Government to Dorchester for Raymond's work by deducting it from the recovery to which plaintiff would otherwise be entitled. With this provision, we are not persuaded that (with respect to the $60,500 Raymond judgment) the defendant will be or has been required to pay twice for the same work done by Raymond.[16]

We are troubled, however, by the possibility that Aetna may recover twice with regard to this judgment, once through our award to it and then again by executing its District Court judgment over against Dorchester. The surety's counsel assures us that this will not be done, but we think that there should be more formal protection. We shall therefore provide that payment of Aetna's judgment here will be subject to the execution of a release, in proper form, of its District Court judgment against Dorchester (and the latter's principals). *Cf. e. g.,* Jensen v. United States, 305 F.2d 444, 449, 158 Ct.Cl. 333, 342, 358 (1962).

### III

The Government has interposed a contingent counterclaim against Aetna, if an award is made to the surety, for those sums previously paid to it which the court now holds should be paid to

---

14. Dorchester has received $122,130; Aetna has received $212,163.80. The total already paid is therefore $334,293.80.

15. Our findings, unchallenged in this respect by defendant, cover about $58,000 worth of changes and extras (over and above the original contract price) in the portion of the work performed before the improper termination. There is also the plaintiff's anticipated profit of some $28,000. Combining these figures with the initial contract price of $265,000 comes to over $351,000—less than defendant has already paid out. (If we subtract the $17,000 of so-called duplication (*see* Part III, *infra*), the total amount roughly equals the sum already paid out.) And this sum does not include the unspecified sum for changes and extras in the part of the work completed after the termination by Aetna's subcontractor, Tredennick-Billings, which would, of course, add to the contract price.

16. In any event, even if part of the $60,500 judgment somehow represented a double payment for work done by Raymond, the surety would be entitled to recover an equivalent sum, so as to be made whole for the excess expenses of completion. *See* Part III, *infra.* Aetna should end up reimbursed for (a) the full $280,427.06 it spent completing the work, and (b) the Miller Act judgment it had to pay to Raymond.

plaintiff. The trial judge denied this counterclaim, and defendant asks us to reinstate and implement it.[17]

The Government is correct in saying that Aetna was paid after its takeover (at least to the extent of $16,961.97) for work included in the award we are today making to the plaintiff—work which Dorchester actually performed.[18] But this does not mean that defendant is entitled to prevail on its counterclaim against Aetna. As we have held in Part II, A, *supra,* the surety can properly recover from the Government, under its take-over agreement, the full reasonable excess costs of completion. We have found that reasonable excess to have been $280,427.06, of which Aetna has received only $212,163.80 from defendant; the balance of $68,263.26 is the amount for which the surety still remains uncompensated, but for which it can recover in this proceeding.

If we were to grant the contingent counterclaim to the extent of $16,961.97 —on the ground that this money, included in the $212,163.80 already paid to Aetna, represented Dorchester's work for which our judgment is now reimbursing plaintiff—we would be required to perform the balancing operation of increasing the $68,263.26 figure, *supra,* by the same amount of $16,961.97 to cover the full excess completion cost owed to the surety. The latter is entitled, in other words, to the full $280,427.06 it spent in completion—so as to be made whole—and whatever part of that total we take away under the counterclaim we must add to Aetna's award in order that it end up compensated for the total of

its completion loss. As Trial Judge Day indicated, the effect of granting the counterclaim would be to leave the surety uncompensated for a portion of its actual loss—a position which would be inconsistent with our holding that the surety should rightfully be reimbursed for its entire loss (to the extent reasonable).

It is true that a comparable counterclaim was granted in Dale Constr. Co. v. United States, Seaboard Surety Co., Intervenor, *supra,* 168 Ct.Cl. 692, 732, 851 (1964), for items previously paid to the surety but which were included in this court's judgment awarded to the contractor. That was a different case, however, in that the contractor was the only plaintiff considered entitled to sue as plaintiff, and the only one to which an award was given; no judgment was entered for the completing surety, the damages suffered by the latter being wholly included in the contractor's judgment; the surety did not recover on its own behalf.

In that situation, where the contractor is the only recognized suing entity, and theoretically the court is not concerned with the surety, it may be that the surety's actual damages (in completing the work) have to be offset by the money it received which should have gone to the contractor; otherwise the contractor, which was the only recipient of the court's award and the only party recognized as entitled to sue here, could possibly receive and retain double payment.[19] The *Dale* court was intent on making sure that the de-

---

17. The judge also denied defendant's counterclaim against plaintiff, but the Government does not except to that denial.

18. Defendant has satisfied us that, out of the $63,602.30 we award the plaintiff on 17 items, the sum of $16,961.97, relating to six of those items, has already been paid the surety. We are not, however, so convinced as to the rest of the counterclaim demand of $46,831.97; aside from this $16,961.97, Dorchester seems to have received payment for all original contract work (not changes or extras) it did itself (excluding Raymond's work for which the con-

tractor never paid but which Aetna paid via the satisfaction of Raymond's District Court judgment for $60,500) and the surety was not paid therefor.

19. The contractor in *Dale* might be liable, under a private indemnity agreement, to pay over to the surety the sums to which the latter was entitled, but this court could not enforce or implement that agreement; so far as the court was concerned in that case, the contractor would receive the entire award. What happened thereafter was not this court's affair.

fendant would in no circumstances have to pay the contractor twice.

In our case, on the other hand, the surety sues on its own behalf and is entitled to recover, as we have held above, in its own name and its own right, under its take-over agreement with the Post Office Department. The award will go directly to it and there is no possibility of the contractor's receiving or retaining double payment. We hold, for this reason, that the *Dale Constr. Co.* precedent (whether or not it should be followed in the future on its own facts) is inapplicable here, and the defendant's contingent counterclaim should be denied.

### CONCLUSION

Plaintiff and the surety intervenor are both entitled to recover. The former's judgment will be in the sum of $63,602.30. The latter's will be in the amount of $128,763.26, and will be subject to execution of the release referred to in Part II, D, *supra,* of this opinion. The defendant's counterclaim against the plaintiff and its contingent counterclaim against the surety will be dismissed.