WILLIAM H. BELL, III, AND MARGARET A. BELL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bell v. Commissioner
Docket Nos. 4979-76, 5007-76, 5010-76, 5019-76.
United States Tax Court
T.C. Memo 1982-660; 1982 Tax Ct. Memo LEXIS 85; 45 T.C.M. (CCH) 97; T.C.M. (RIA) 82660; November 16, 1982. *85 Three physicians formed a professional corporation (NA).They then formed a subchapter S corporation (S) to provide X-ray services for NA. They gave the stock in S to designated relatives (father of one physician, children of the other two physicians). Held: (1) S is recognized for tax purposes as a separate corporation. (2) S earned income from providing X-ray services to NA. (3) Respondent's allocation of income between NA and S under sec. 482, I.R.C. 1954, is upheld in part. (4) Income thus allocated is treated as dividends from NA to the physicians, as NA's shareholders. (5) The physicians are the true owners of S's stock and distributions from S to its nominal shareholders are treated as dividends to the physicians. The three physicians and two other individuals formed a limited partnership (P), which bought seven parcels of land. On one parcel there was a building in which a medical practice was being conducted. The building was demolished 22 months after P bought it. Held: (6) P did not buy the building with the intention of demolishing it; demolition loss is deductible. Charles E. Elrod, Jr., for the petitioners. Vallie C. Brooks, for the respondent. CHABOT MEMORANDUM *86 FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal income taxes against the individual and corporate petitioners as follows: Taxable
Docket No.
Year
Deficiency
William H. Bell, III, and
4979-76
1971
$28,027.21
Margaret A. Bell
1972
27,655.22
Dwight M. Plott and
5007-76
1971
26,992.43
Harriett R. Plott
1972
33,634.79
Frank P. Haws and
5010-76
1971
34,617.82
Linda B. Haws
1972
38,418.93
North Alabama
5019-76
1971
24,311.64
Neurological, P.A.
1972
21,651.28
These cases have been consolidated for trial, briefs, and opinion. The parties have settled most of the adjustments made in notices of deficiency. The issues remaining for decision are as follows: (1) Whether X-Ray Services, Inc. (hereinafter sometimes referred to as "Services"), was for tax purposes an entity separate from the corporate petitioner, and if so, whether respondent's determination to allocate all of Service's income and expenses to the corporate petitioner under section 482[2] was unreasonable, arbitrary, or capricious; *87 (2) Whether petitioner-husbands must include in their respective gross incomes amounts paid by Services to certain relatives during the years in issue; and (3) Whether, when a limited partnership in which petitioner-husbands were partners purchased a parcel of real estate, it intended to demolish the medical office building situated thereon. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions in the instant cases were filed, petitioners William H. Bell, III (hereinafter sometimes referred to as "Bell"), and Margaret A. Bell, husband and wife, resided in Huntsville, Alabama; petitioners Dwight M. Plott (hereinafter sometimes referred to as "Plott") and Harriett R. Plott, husband and wife, resided in Huntsville, Alabama; petitioner Frank P. Haws (hereinafter sometimes referred to as "Haws") resided in Huntsville, Alabama, and petitioner Linda B. Haws resided in Jackson, Tennessee (Haws and Linda B. Haws were husband and wife when their 1971 and 1972 income tax returns were filed); and petitioner North Alabama Neurological, P.A. (hereinafter sometimes referred to as "North *88 Alabama"), a corporation, had its principal office in Huntsville, Alabama. General
North Alabama is a professional association incorporated by Bell, Plott, and Haws under Alabama law on January 2, 1969, to engage in the practice of neurosurgery and neurology. From January 2, 1969, through the years in issue, Bell, Plott, and Haws were equal owners of all of North Alabama's voting stock [3] and were employed by North Alabama as physicians. [4]
Before North Alabama was incorporated, Bell and Haws were engaged in the practice of medicine as partners specializing in neurosurgery. At that time, Plott, who occupied an office adjoining that of Bell and Haws (located at 401 Lowell Drive, in Huntsville), was engaged in the practice of medicine as a sole proprietor specializing in neurology. North Alabama took over these offices. Neurosurgery *89 is the srgical subspeciality concerned with the treatment of diseases of the brain, skull, spinal cord, spinal structures, and peripheral nerves. Neurology is the branch of medicine concerned with the diagnosis and treatment of conditions of the nervous system, especially chronic problems, such as multiple sclerosis and epilepsy. A neurologist may be distinguished from a neurosurgeon in that a neurologist treats the medical problems of the nervous system, while a neurosurgeon treats the surgical problems. Bell, Plott, and Haws were consulting neurologists and neurosurgeons. Consulting neurologists and neurosurgeons do not maintain regular patients. Rather, patients are referred to them from other physicians. The consulting neurologist or neurosurgeon will diagnose and begin treatment of such a patient and then return the patient to the referring physician. X-rays of a patient's body are considered a necessary diagnostic tool by physicians who consult in the area of neurosurgery and neurology. In the majority of cases, a patient referred to a consulting neurosurgeon or a neurologist needs an X-ray of sufficient quality to allow the neurosurgeon or neurologist to properly evaluate *90 the cause of the pain which the patient usually suffered. In some cases, the patient when referred to the neurosurgeon or neurologist brings along a suitable X-ray, but in the majority of cases the patient needs to have an X-ray made before the initial examination by the neurologist or neurosurgeon. Bell, Haws, and Plott regularly used the Huntsville Clinic to have X-rays made, until North Alabama was incorporated. North Alabama then regularly used the Huntsville Clinic to have X-rays made, until about March 5, 1969, when Services was incorporated. Most of the other physicians renting space at 401 Lowell Drive also used the Huntsville Clinic. When an X-ray was needed, a patient of North Alabama or of one of these other physicians was sent across the street to the Huntsville Clinic, signed in, and was X-rayed by one of the Huntsville Clinic's X-ray technicians. After the X-ray was taken and developed, the patient carried the X-ray back to the physician's office. If the X-ray was not adequate, then the patient would have to make a second trip to the Huntsville Clinic for another X-ray. The distance from North Alabama's office to the Huntsville Clinic's X-ray department was about *91 200-225 feet. The Huntsville Clinic did not provide the professional services connected with reading X-rays. The X-ray technicians at the Huntsville Clinic kept a log of X-rays and prepared an X-ray request slip for each patient X-rayed. At the end of each day, these slips were sent to the Huntsville Clinic's office. The Huntsville Clinic prepared an invoice for each nonmember physician (such as those at North Alabama) at the end each month listing the patient's name, type of X-ray, the fee for the particular X-ray, as listed in the Huntsville Clinic fee schedule, and the total of such fees reduced by a discount. Members of the Huntsville Clinic received a discount of 70 percent and nonmembers (such as North Alabama) received a 40-percent discount. North Alabama paid the Huntsville Clinic this discounted fee listed on the invoice regardless of the amount that North Alabama collected from its patient. During the years in issue, the Huntsville Clinic continued to provide X-ray services to nonmember physicians, seven or eight of whom had offices in the same building as North Alabama. The Huntsville Clinic also continued to bill nonmembers at a 40-percent discount. Another X-ray facility *92 in the Huntsville area, Radiology Associates, did not provide a discount and charged physicians the full fee during the same time period. The fees charged by Radiology Associates included an amount for the professional services of its radiologist for reading the X-rays. The X-ray equipment used by the Huntsville Clinic during 1969 through 1972 was purchased in 1964; it might have cost as much as an additional 20 percent to purchase similar equipment in 1969. The arrangement for X-ray services with the Huntsville Clinic was disruptive to North Alabama's practice because of backups experienced by the Huntsville Clinic's X-ray facilities which in turn caused delays in the return of patients to North Alabama's offices and created scheduling difficulties for North Alabama. The arrangement also was inconvenient for North Alabama's patients because sometimes they had to endure adverse weather conditions to go to the Huntsville Clinic as well as long delays once they reached the Huntsville Clinic. In addition, it was difficult for some patients, having arrived at North Alabama's offices in wheelchairs or by ambulance, to cross the street in order to go to the Huntsville Clinic for their *93 X-rays. In order to alleviate these problems, Bell, Plott, and Haws decided to set up an X-ray facility in North Alabama's offices.Bell wanted his father--and Plott and Haws wanted their respective children--to share in the income from the X-ray facility. Bell, Plott, and Haws were advised by North Alabama's attorney and accountant that conducting the X-ray business in a separate corporation would be advantageous from a tax standpoint and would serve to limit any liability arising from such activities. Accordingly, they decided to organize a new corporation to provide on-site X-ray services for North Alabama. Organization and Operation of Services
Services was incorporated by Bell, Plott, and Haws under Alabama law on March 5, 1969, to own and operate "the business of an x-ray laboratory". A corporation permit which authorized Services to do business in Alabama, and which noted that Services was conducting an X-ray laboratory business, was issued by the State of Alabama for each of the years 1969 through 1973. Early in 1969, X-ray equipment with a total cost of $19,928 was purchased under Haws' name. [5] The proceeds of two loans by American National Bank of Huntsville (hereinafter *94 referred to as "the Bank") to Services were used to purchase the X-ray equipment. [6] *95 These loans, which were not formally guaranteed by Bell, Plott, or Haws, were repaid by Services by October 15, 1970. The X-ray equipment was shown as an asset on Services' Federal income tax returns for 1969 through the years in issue. In March 1969, the X-ray equipment was put into operation in one of the rooms which made up the offices occupied and rented by North Alabama and an X-ray technician was employed to perform X-ray services. A typical X-ray transaction occurred as follows: When one of North Alabama's physicians determined that the patient needed an X-ray, the physician pulled a color-coded flag out-side the examining room door to indicate that an X-ray was needed.The physician also wrote on the patient's chart the type of X-ray that was needed. On seeing *96 the flag, the X-ray technician helped the patient put on an appropriate gown and escorted the patient to the room containing the X-ray equipment. The X-ray technician then took the X-ray, kept the patient in the X-ray room until the X-ray was developed and the X-ray technician was satisfied that the X-ray was technically adequate, and then escorted the patient back to the examining room. The X-ray technician carried the X-ray to the X-ray view box. After the physician read the X-ray, completed his examination of the patient, recorded his findings and opinion, and had no further need for the X-ray, the X-ray was removed by the X-ray technician and filed in a storage cabinet in a room adjoining the room containing the X-ray equipment. From March 21, 1969, through the years in issue a chronological log of X-rays was maintained by the X-ray technician. The log lists the date of the X-ray (or series of X-rays), the patient's name, the physician's name (or letter(s) designating the physician's name), a brief description of the X-ray(s), and the fee [7] to be charged the patient for the X-ray(s). The X-rays (or series of X-rays) recorded in the log numbered about 800 for 1969 (March through *97 December), 1,200 for 1970, 1,200 for 1971, and 1,450 for 1972. The fee for X-rays recorded in the log for the years in issue totaled about $34,200 in 1971 and $38,000 in 1972. North Alabama billed its patients for X-rays, and paid to Services (on about a monthly basis) 85 percent of the gross charges for X-rays so billed, regardless of the amount actually collected by North Alabama from the patient. (Thus, in effect, North Alabama received a 15-percent discount from Services.) Services did not bill patients directly for X-rays. In fact, North Alabama's patients were not aware of Services' existence. From Services' organizational meeting until its liquidation, Bell, Plott, and Haws constituted the board of directors [8] of Services and provided the management of Services, including the hiring and control of its only employee (the X-ray technician) and the signing of checks. The X-ray technician performed the above-described X-ray services for Services and also performed various tasks for North Alabama, such as filing patients' records, assisting in insurance work, and checking *98 blood pressure. Services and North Alabama each paid one-half of the X-ray technician's salary and payroll taxes.
North Alabama's fees charged to its patients for X-ray services were revised from time to time so as to keep them in line with those charged for similar services by the Huntsville Clinic, Radiology Associates, and Huntsville Hospital.
From March 1969 through the years in issue, Services maintained a checking account in its name. Services paid its suppliers, and generally paid its own expenses. Checks drawn on this account were prepared by a public accountant, Jerry W. Bevil (hereinafter referred to as "Bevil"), and were signed by Bell, Plott, or Haws. During the years in issue, Bevil maintained the books and records of Services and of North Alabama. Bevil was also responsible for computing the monthly amount to be remitted to Services for X-rays, and for billing North Alabama therefor. Bevil prepared North Alabama's and Services' income tax returns for the years in issue. Services separately paid Bevil for the accounting and tax services he performed for Services. During the years in issue, Services did not *99 pay rent to North Alabama for the use of North Alabama's office space and did not otherwise reimburse North Alabama for any expenses attributable to that space. North Alabama's insurance policy provided for coverage against professional liability arising out of Services' operations; Services did not reimburse North Alabama for this coverage and did not separately insure its operations. During the years 1969 through 1972, Services performed X-ray services only for North Alabama; Services did not advertise its X-ray services. Services did not maintain a post office box or telephone and was not listed in the local telephone directory during these years. For the years in issue, Services filed Federal small business corporation income tax returns, quarterly tax returns for Federal and State payroll taxes, State franchise tax and corporate stock assessment tax returns, and county personal property tax returns. On its income tax returns for 1969 through 1972, Services reported gross income, deductions, and taxable income as shown in table 1. Table 1
1969
1970
1971
1972
Gross Receipts
$18,565.00
$30,748.08
$28,960.88
$32,456.20
Deductions
Salaries and wages
4,960.51
6,925.03
6,965.26
3,850.28
Repairs
108.25
Taxes
236.57
769.61
1,321.76
1,116.73
Interest
1,143.20
406.67
31.18
Depreciation
(X-ray equipment)
4,151.50
3,944.13
2,958.09
2,218.56
Supplies
3,254.22
3,650.95
3,849.67
3,613.56
Office supplies/expense
28.02
5.22
2.31
.83
Training expense
55.00
Legal and accounting
87.50
345.00
446.25
393.75
Casual labor
502.50
165.00
Total
$14,024.77
$16,046.61
$16,077.02
$11,358.71
Taxable Income
$ 4,540.23
$14,701.47
$12,883.86
$21,097.49
For *100 the years in issue, North Alabama claimed deductions on its income tax returns for X-ray expenses in the amounts of $28,960.88 in 1971 and $32,456.20 in 1972. Services reported the same amounts as gross income (see table 1, supra). Both North Alabama and Services used the cash receipts and disbursements method of accounting in reporting income and deductions on their income tax returns. For the notice of deficiency issued to North Alabama, respondent determined that all of Services' income and deductions for 1971 and 1972 must be reported by North Alabama. The following explanation was attached to the notice of deficiency. (d) In the years 1971 and 1972 gross income earned, and deductions incurred, by you in the conduct of an x-ray service business were not reported by you and were improperly reported by X-Ray Service, Inc., a corporation owned or controlled by your stockholders. Under the authority of sections 61 and 482 of the 1954 Code your taxable income is increased by the amounts of $12,883.86 and $21,097.49 for the tax years 1971 and 1972, respectively, as shown below. It is determined that this action is necessary to prevent the evasion of taxes or to clearly reflect *101 income. 1971
1972
Gross income increased
$28,960.88
$32,456.20
Deductions increased
16,077.02
11,358.71
Increase in taxable
income
$12,883.86
$21,097.49 Arm's-length charges for the X-ray services provided by Services to North Alabama in 1971 and 1972--net of the cost of rent, utilities, and insurance--are $10,000 (for 1971) and $11,000 (for 1972) less than the amounts set forth in table 1, supra, as "Gross Receipts" for the respective years.
Ownership of Services
Bell, Plott, and Haws were the original subscribers to Services' stock; each subscribed to 333 1/3 shares of common stock with a par value of $1 (the total authorized capital of Services was 1,000 shares of $1 par value common stock). On the day Services was incorporated, Bell, Plott, and Haws purportedly assigned all of their right, title, and interest in their respective subscriptions to the Services' stock. Bell assigned his subscription to his father, William H. Bell, Jr. (hereinafter sometimes referred to as "Bell's father"); Plott assigned his subscription equally to his children, Charles Randall Plott and Marion Dwight Plott (hereinafter sometimes referred to as "Charles" and "Marion", respectively); Haws assigned his subscription *102 equally to his children, Laura Ann Haws, Frank P. Haws, Jr., Angela Haws, Ashley Sanford Haws, and Lyle Sanford Haws (hereinafter sometimes referred to as "Laura", "Frank", "Angela", "Ashley", and "Lyle", respectively). Stock certificates dated March 5, 1969, were issued by Services to Bell's father for 333 1/3 shares, to Charles and Marion for 166 2/3 shares each, and to Laura, Frank, Angela, Ashley, and Lyle for 66 2/3 shares each. [9]
On April 3, 1969, Services elected (see n. 22, infra) to be treated as a small business corporation under the provisions of subchapter S of chapter 1 (hereinafter sometimes referred to as "a subchapter S corporation"). The shareholder consents were made by Bell's father, Harriett R. Plott as custodian of Charles and Marion, and Haws as custodian of Laura, Frank, Angela, Ashley, and Lyle. On February 1, 1971, William Bradley Plott (hereinafter sometimes *103 referred to as "William"), was born to Plott and Harriett R. Plott. On December 23, 1971, Meredith Haws (hereinafter sometimes referred to as "Meredith"), was born to Haws and Linda B. Haws. On January 24, 1972, new stock certificates were issued by Services to reflect transfers of stock among Plott's children and Haws' children [10]--the transfers of 55 5/9 shares each from Charles and Marion to William, and the transfers of 11 1/9 shares each from Laura, Frank, Angela, Ashley, and Lyle, to Meredith. As a result of these transfers, the number of shares of stock in Services outstanding in the name of each of Plott's children and of each of Haws' children was 111 1/9 shares and 55 5/9 shares, respectively; the number of shares outstanding in the name of Bell's father remained the same (333 1/3 shares). The decision to transfer shares from the two older Plott children (who were then about 10 and 7 years old) to William was made by Plott in order to give William the same number of shares as Charles and Marion. The decision *104 to transfer shares from the five older Haws children to Meredith was made by Haws, based on his view of what was fair and his belief that the five older Haws children (whose ages then ranged from about 21 to 8) would not object. On January 2, 1974, Services was dissolved and liquidated. On that same date, X-Ray Services, Ltd., was formed to take over the X-ray services activities previously performed by Services. The minutes of the meeting at which Services' shareholders and directors agreed to liquidate and dissolve Services recite that The President [Plott] reported that the Corporation [Services] had been inactive for some time and that it would be in the best interest of the shareholders to liquidate the Corporation. * * * President further reported * * * that the only remaining asset of the Corporation was X-ray equipment of net book value of $4,991.79. The decision to replace Services, a subchapter S corporation with ten shareholders, with X-Ray Services, Ltd., a limited partnership, was made by Bell, Plott, and Haws so that the children of a new North Alabama shareholder (i.e., Maccubbin, see note 3, supra) could share in the income from the activities. [11] *105 Services' minute book reflects no entries after its first meetings on March 5, 1969, and before the January 2, 1974, meeting at which its shareholders and directors agreed to liquidate and dissolve the corporation. Table 2 compares the interests in Services before the after the January 24, 1972, stock certificates were issued and the interests in X-Ray Services, Ltd., as shown on its Federal partnership tax returns for 1974 and 1975. Table 2
Percent Interest
Percent Interest in
in Services
X-Ray Services, Ltd.
Name of Shareholder
or Partner
1969-1972
1972-1974
1974
1975 [4]
Bell's father
33.333
33.333
24.750
19.8 Charles
16.667
11.111
8.250
6.66
Marion
16.667
11.111
8.250
6.66
William
11.111
8.250
6.66
Laura
6.667
5.556
4.125
3.33
Frank
6.667
5.556
4.125
3.33
Angela
6.667
5.556
4.125
3.33
Ashley
6.667
5.556
4.125
3.33
Lyle
6.667
5.556
4.125
3.33
Meredith
5.556
4.125
3.33
Eliza Maccubbin [1]
12.375
9.9 James Maccubbin [1]
12.375
9.9 David Louis Boyer [2]
6.66
Katherine E. Boyer [2]
6.66
Daniel L. Boyer [2]
6.66
Bevil
1.000
1.0 [3] *106 100
[3] 100
100
100
Generally, a physician associating with North Alabama would not become a member of North Alabama until about a year later. On becoming a member, the physician would be permitted to have his children become limited partners in X-ray Services, Ltd. In 1977, Bell retired from neurosurgery and was no longer a member of North Alabama, but Bell's father remained a partner in X-Ray Services, Ltd. Bell's father and each of Plott's children reported income from Services on their respective tax returns for 1969 through 1972. During respondent's audit which gave rise to this action, it was discovered that Haws' children had not filed tax returns for 1971 and 1972; their tax returns were prepared and filed at that time. The only income reported was from Services. On occasion, Services made cash distributions with respect to its stock in amounts proportionate to stockholdings. Bell sent any amounts so distributed to his father and had no dealings with these amounts thereafter. Plott and Haws deposited any such amounts *107 in their children's savings accounts. In 1971 and 1972, Services made cash distributions with respect to its stock totaling $14,700 and $21,000, respectively. In the notices of deficiency respondent determined that Services' cash distributions constituted dividend income in equal shares to Bell, Plott, and Haws, and so each of their respective taxable incomes was increased by $4,900 for 1971 and $7,000 for 1972.
For the years in issue, (1) Services carried on an X-ray laboratory business, (2) Services and North Alabama were separate taxable entities, (3) Services and North Alabama were owned and controlled by the same interests, and (4) Bell, Plott, and Haws were the true owners of the Services' stock ostensibly owned by Bell's father, Plott's children, and Haws' children, respectively. Demolition Loss
On February 17, 1971, Medical Properties, Ltd. (hereinafter referred to as "Properties"), a limited partnership, was created for the purpose of acquiring real and personal property to construct and operate a medical office center or clinic in Huntsville. During the years in issue, Bevil was Properties' sole general partner. Initially, Properties had four limited [12] partners, Bell, *108 Plott, Haws, and B. L. Bercaw, [13] with each owning a capital interest of 24.75 percent and sharing profits and losses in the same percentage. Bevil owned the remaining one percent. On August 6, 1971, Bell, Plott, and Haws acquired B. L. Bercaw's 24.75-percent interest in Properties.From August 6, 1971, through the end of 1972, Bell, Plott, and Haws were Properties' only limited partners, with each owning a capital interest of 33 percent and sharing profits and losses in the same percentage. On February 27, 1971, Properties acquired two parcels [14] of real estate in Huntsville from Grady B. Huckaby (hereinafter referred to as "Huckaby") for a total purchase price of $100,000. One was a small parcel *109 at 901 Madison Street (the southeast corner of Madison Street and Harris and Rands Alley) [15] *110 that had situated on it a one-story building used by Huckaby in his medical practice (hereinafter referred to as "the Huckaby building"). The other was a larger, irregularly shaped, unimproved parcel located north on Madison Street from the Huckaby building. The two parcels were about 120 feet apart, being separated by a paved road (Harris and Rands Alley) and an automobile fuel and service station (at the northeast corner of Madison Street and Harris and Rands Alley). Of the $100,000 purchase price, Properties allocated $75,000 to the Huckaby building. The Huckaby building was located directly across Madison Street from the Huntsville Hospital, the primary center of patient care in Huntsville and the primary hospital used by Bell, Plott, and Haws for the treatment and care of their patients. The Huckaby building was about 20 years old; it had about 3,000 square feet of space consisting of two waiting rooms, a reception area, five patient examining rooms, three physicians' offices, an X-ray room with an adjoining darkroom, a laboratory, a room for taking electrocardiograms and measuring basal metabolic rates, three lavatories, utility and janitorial rooms, and various linen and coat closets. At one time, the Huckaby building had been used by Huckaby and two other doctors for their general medicine practices. Before the sale to Properties, Huckaby told Bell, Plott, and Haws that the air conditioning units had been replaced and mechanical repairs had recently been completed. The Huckaby building had no on-site parking facilities. [16] The second parcel purchased from Huckaby was a vacant lot; it could be used for parking about 35-40 automobiles, if it were improved. About the time petitioners purchased *111 the Huckaby building, some properties on Harris and Rands Alley were condemned by the housing authority. Bell, Plott, and Haws then began to look at the possibility of purchasing property that could be used for parking and was adjacent to the Huckaby building. During 1971, Properties acquired five other parcels of real estate (on Harris and Rands Alley) adjacent to or in the vicinity of the Huckaby building, as shown in table 3. Table 3
Date of
Purchase Price
Proximity to the
Purchase
Seller
(Approximated)
Huckaby Building
Feb. 18, 1971
Mastin
$12,000
separated by Sales #2 parcel
May 6, 1971
Love
15,000
separated by Sales #2 and
Mastin parcels
May 17, 1971
Sales #1
15,000
separated by Sales #2,
Mastin, and Love parcels
Jul. 8, 1971
Sales #2
14,000
adjacent (east)
Aug. 6, 1971
Toliver
31,200
across Harris and Rands
Alley from Love and
Mastin parcels
The Huckaby building parcel and the Mastin, Love, Sales #1 and Sales #2 parcels constitute a chain of five contiguous parcels, each *112 with frontage on Harris and Rands Alley. The sizes of the Mastin, Love, and Sales #1 parcels were each equal to or greater than the size of the Huckaby building parcel. Of these five parcels, only the Huckaby building parcel has frontage on Madison Street. The Toliver parcel is adjacent to and south of the unimproved tract acquired from Huckaby and it is adjacent to and east of the service station. On February 27, 1971, Properties agreed to lease the Huckaby building to Huckaby on a month-to-month basis for $600 per month. Either Properties or Huckaby could terminate the lease with 30-days' written notice. [17]
Shortly before Properties acquired the two parcels from Huckaby, Bell, Plott, and Haws met with Huckaby and Huckaby's realtor, Alvin Blackwell (hereinafter referred to as "Blackwell"), at the Huckaby building.At this meeting, Bell, Plott, and Haws toured the Huckaby building and looked over a diagram of its floor plan. Huckaby told Bell, Plott, and Haws that the Huckaby building had been constructed in such a manner as to accommodate a second story. Bell, Plott, and Haws did not consult *113 with any professional before Properties acquired the Huckaby building as to the feasibility of renovating or adding a second story to the Huckaby building, or as to any zoning restrictions applicable to the Huckaby building. At the time Properties acquired the Huckaby building, North Alabama was gradually outgrowing its leased facilities of about 3,800 square feet at 401 Lowell Drive. North Alabama's lease was to expire in 1973 or 1974. The primary difference between North Alabama's leased facilities [18] and the Huckaby building (aside from area) was that the patient examining rooms in the Huckaby building were larger but fewer in number. Because of the nature of its practice, North Alabama did not need patient examining rooms as large as a general practitioner would need. Sometime in the summer of 1971, an architect, Harvie P. Jones (hereinafter referred to as "Jones"), advised Plott, Haws, and Bell that (1) the Huckaby building did not conform to the zoning setback requirements and therefore any alteration of, *114 or addition to, the structure could not be made unless a variance was obtained, and (2) in any event, it would cost about as much to add a second story to the Huckaby building as it would cost to build a similar structure from scratch because adequate drawings of the existing structure, foundation, and electrical and plumbing systems were not available. On August 25, 1971, after the meeting with Jones, Bell, Plott, and Haws first met with Jones' partner, William W. Herrin, Jr. (hereinafter referred to as "Herrin"), to discuss the design of a four- or five-story professional office building that Bell, Plott, and Haws had decided might be constructed on the five contiguous parcels that Properties owned (the Huckaby building parcel and the other four parcels on the south side of Harris and Rands Alley). Rough drawings of the proposed building were prepared by Herrin and dated August 30, 1971. The plans for such a building called for the demolition of the Huckaby building. Bell, Plott, and Haws did not discuss renovating the Huckaby building with Herrin. On November 1, 1971, Properties entered into a contract with Creative Displays to lease a billboard for display advertising purposes. *115 The contract provided for monthly payments in the amount of $150 for one year. [19] This billboard was erected on the parcel with the Huckaby building; Herrin's drawing of the proposed building was displayed on it. At some point, Bell, Plott, and Haws decided not to build the four- or five-story building on the five contiguous parcels. The Huckaby building was demolished sometime in December 1972; the land remained vacant it was sold several years later. A few other buildings situated on the parcels owned by Properties were demolished at the same time. On August 20, 1973, Properties entered into a contract with J.T. Schrimsher Construction Company, Inc., to construct a doctor's clinic building on the Toliver parcel [20] *116 (see table 3, supra) for $149,000.After it was constructed, this building was used by North Alabama.by the end of 1976, North Alabama needed more room than the 5,600 square feet of floor space in this building and acquired a new building next door. In 1966, five years before the formation of Properties, Haws had attempted to convince a group of physicians to invest in a new medical offfice complex, but abandoned the idea when only one other physician was interested. Haws enjoyed dealing in land and was more involved in Properties' purchases of real estate than Bell and Plott.
On its partnership tax return for 1972, Properties claimed a loss deduction with respect to the demolition of the Huckaby building in the amount of $71,875, Properties' adjusted basis in the Huckaby building at the beginning of 1972. [21] In the notices of deficiency issued to Bell, Plott, and Haws, respondent disallowed $68,750 of Properties' loss deduction for 1972; the remaining $3,125 was allowed as a depreciation deduction for the period that the Huckaby building was rented to Huckaby in 1972. At the time *117 Properties acquired the Huckaby building, neither Properties nor its partners intended to demolish the Huckaby building. OPINION I. North Alabama
Respondent contends that Services was a sham because it did not engage in any substantive business activity and lacked any substantial business purpose. [22] *118 Further (respondent argues), the members of North Alabama operated and controlled the X-ray business and so the X-ray income was earned by North Alabama and, under section 61, is taxable to North Alabama. In the alternative, if the Court concludes that Services is a separate entity for Federal income tax purposes, then respondent relies on section 482.Respondent urges, under all of these analyses, that the activities of North Alabama and Services constitute a single, integrated business enterprise and accordingly all of the income and deductions reported by Services for 1971 and 1972 must be included in North Alabama's taxable income for these years. Petitioners maintain that (1) Services engaged in substantial business activities and so must be recognized as an entity separate from North Alabama, (2) respondent's allocation to North Alabama of all of Services' income and deductions under section 482 is arbitrary and capricious, *119 and (3) North Alabama's payment to Services of 85 percent of the amounts billed to North Alabama's patients for X-rays should be sustained because there was "no established arms-length [charge] prevalent in the Huntsville area." We agree with petitioners that Services is to be recognized as a separate entity for Federal income tax purposes. [23] *120 We agree in part with respondent's alternative position in that a portion of Services' income is properly to be allocated to North Alabama under section 482. A. Sham Corporation
A corporation is to be recognized as a separate taxable entity if either: (1) the purpose for the formation of the corporation is the equivalent of a business activity or (2) the incorporation is followed by the carrying on of business. Moline Properties v. Commissioner,319 U.S. 436, 438-439 (1943). Although, as respondent notes, in Moline Properties it was the taxpayer who sought to disregard the separate existence of a corporation, the Moline Properties test applies as well where it is respondent who seeks to disregard the separate existence of a corporation. Achiro v. Commissioner,77 T.C. 881, 901 (1981). [24] *121 If neither requirement is met, the corporation is to be declared a sham and all income is to be attributed to the true earner. Shaw Construction Co. v. Commissioner,35 T.C. 1102, 1114-1117 (1961), affd. 323 F.2d 316 (CA9 1963). The following factors point toward the conclusion that Services carried on business after its incorporation: (1) Although the initial dealings regarding the purchase of X-ray equipment were in Haws' name, the Bank lent to Services the funds to pay for this equipment, and neither Bell, Plott, nor Haws formally guaranteed Services' obligations in this regard. (2) The X-ray equipment was operated by a technician who was employed by Services to perform such services, and who also kept Services' record of the equipment's use. (3) The business that Services conducted was the same sort as that being conducted at the same time in the same city by at least two other entities--the Huntsville Clinic and Radiology Associates. (4) The business conducted by Services was an active one, involving 100 to 120 X-rays per month. (5) Services dealt with others in its own name by paying its suppliers, maintaining a checking account, paying for its expenses (except for insurance, rent, and utilities), repaying its loan from the Bank, paying State corporate income taxes, paying State corporate stock assessment and franchise taxes, paying Federal and State employment taxes, filing Federal *122 small business corporation income tax returns, paying county personal property taxes, and obtaining and renewing each year a State permit which authorized it to do business in Alabama and which noted that Services was conducting an X-ray laboratory business. The following factors point toward Services not being a separate taxable entity: (1) North Alabama's patients were unaware of the existence of Services; (2) the X-ray equipment was located in North Alabama's offices; (3) Services paid no rent or utilities for the space provided by North Alabama; (4) Services served only North Alabama; (5) North Alabama paid the insurance premium for insurance coverage of Services; and (6) Services did not advertise or list in the local telephone directory. Based on the record herein, we conclude that Services carried on a business after its incorporation [25] *123 and so it is to be recognized as a separate taxable entity. See Achiro v. Commissioner,supra. See also Davis v. Commissioner,64 T.C. 1034 (1975). Respondent maintains that his position in the instant cases is essentially the same as that adopted by this Court in Aldon Homes, Inc. v. Commissioner,33 T.C. 582 (1959). In Aldon Homes, we concluded that 16 corporations ("the alphabet corporations") "were not organized for any purpose other than the obtaining of tax benefits; that they did not carry on the business activities which resulted in the profits from the development of Tract 17169, nor any substantial business activities, and consequently did not earn the income in question" (33 T.C. at 597). Thus, we held that the entire net income from the development of the tract was taxable to Aldon Homes, Inc., the taxpayer that had controlled every material step in the production of the income. The contractors who worked on the lots in Aldon Homes were instructed to bill the alphabet corporations, but virtually all the arrangements had already been made before the alphabet corporations appeared on the scene. In the instant cases, the *124 work (not merely the record-keeping) was done by Services' employee, and done on a continuing basis. The Bank made its loan to Services.Services paid its taxes and its suppliers. We believe that this aspect of the comparison between Aldon Homes and the instant cases is a distinction with a difference, and so we conclude that our holding in Aldon Homes is consistent with our holding for petitioners in the instant case on the sham corporation issue. Shaw Construction Co. v. Commissioner,supra, cited by respondent, is distinguishable from the instant cases on essentially the same basis as Aldon Homes.
Respondent cited Noonan v. Commissioner,52 T.C. 907 (1969), affd. 451 F.2d 992 (CA9 1971). The corporations in Noonan merely served as limited partners in partnerships the general partners of which were the individuals who owned the corporations. Our findings of fact in Noonan do not disclose that the corporations conducted any business activities. The corporations appear to have been passive. In the instant cases, Services did conduct business activities. Consequently, Noonan appears to be essentially irrelevant to the instant cases. Respondent cites a number of sale-leaseback *125 cases, which also seem to us to be essentially irrelevant to the business activities situation we face in the instant cases. We hold, for petitioners, that Services was not a sham, and that it is to be recognized as a separate entity for Federal income tax purposes. B. Assignment of Income
Respondent, relying on Lucas v. Earl,281 U.S. 111 (1930), contends that North Alabama is the true earner of the income derived from the X-ray business. Respondent claims that the X-ray services were rendered through North Alabama's officers and employees and the use of its facilities. Therefore, respondent concludes, North Alabama should be taxed on this income.
Petitioners argue that Services is the true earner of the X-ray income because it owned the capital items and employed the X-ray technician. We have found that Services carried on an X-ray laboratory business and was a separate taxable entity. This is the business that generated the income in dispute. Apart from the impact of section 482, we conclude that Services was the true earner of income from the X-ray business. Accordingly, we reject respondent's assignment of income argument. Pacella v. Commissioner,78 T.C. 604, 622 (1982); *126 Davis v. Commissioner,64 T.C. at 1044-1045. We hold for petitioners on this issue. C. Section 482
Respondent maintains that all of Services' income and expenses must be allocated to North Alabama under section 482. He contends that petitioners have failed to show the value of the services performed by Services and so there is no basis in the record for making only a partial allocation to North Alabama. Petitioners assert that respondent's 100-percent allocation to North Alabama is arbitrary and that all of the X-ray income was properly reported by Services. They contend that there is no established arm's-length charge for X-rays prevalent in the Huntsville area and that under the circumstances, the percentage (85 percent of the fee charged to the patient) that they used to compute Services' income is proper and should be sustained. We agree with the respondent that an allocation is appropriate; however, we believe that only part of Services' income should be allocated back to North Alabama. Section 482[26] provides in relevant part that, in the case of two corporations owned or controlled directly or indirectly by the same interests, [27] the Secretary may allocate gross income *127 and deductions between them if he determines that the allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of the corporations. Respondent's determinations as to section 482 *128 allocations are to be set aside only if "unreasonable, arbitrary, or capricious". Your Host, Inc. v. Commissioner,489 F.2d 957, 960 (CA2 1973), affg. 58 T.C. 10, 23 (1972); Grenada Industries, Inc. v. Commissioner,17 T.C. 231, 255 (1951), affd. 202 F.2d 873 (CA5 1953). The standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. See section 1.482-1(b)(1), Income Tax Regs.
What constitutes an arm's-length charge for the X-ray services is the amount which would have been charged for the same or similar services in independent transactions with an unrelated party under similar circumstances. Petitioners maintain that it was appropriate for Services to charge North Alabama 85 percent of the fees that North Alabama charged to its patients. Bell and Haws testified that the payment to Services of 85 percent of the X-ray charges made by North Alabama to its patients was intended to take into account North Alabama's billing expenses and losses from the failure of patients to pay, which, in their opinion, would not exceed 15 percent of the charges. Bell and Plott also testified that they had believed North Alabama had received *129 a 15- or 20-percent discount on X-rays from the Huntsville Clinic, and so the 15-percent discount allowed North Alabama seemed to be in line with the Huntsville Clinic's charges. This testimony by Bell, Plott, and Haws appears to us to conflict with reality. Firstly, the Huntsville Clinic provided a 40-percent discount; i.e., it charged North Alabama and others substantially less than Services charge North Alabama. Secondly, we doubt that North Alabama would have willingly conceded all possible profits to an unrelated provider of X-ray services, especially in light of the availability of the Huntsville Clinic as a competitive constraint on high prices.
We conclude that petitioners have failed to prove that a similar arrangement with an unrelated party would have produced charges as high as those paid by North Alabama to Services. Cf. Davis v. Commissioner,64 T.C. at 1040.
Respondent's determination (allocating all of Services' income and expenses) is essentially equivalent to a determination that an arm's-length charge would be about 47 percent (for 1971) and 30 percent (for 1972) of the fees that North Alabama charged to its patients. [28] *130 We are unwilling to accept respondent's determination, because we do not believe that an unrelated X-ray laboratory would be willing to enter into an agreement guaranteeing it no profit, which is what respondent's allocation amounts to. Since the Huntsville Clinic could charge prices higher than those in effect determined by respondent--and continue to have customers at those higher prices--we believe that an unrelated X-ray laboratory would be likely to charge prices higher than those determined by respondent. Accordingly, we conclude that respondent's determinations on this point are in error. The record in the instant cases leads us to the conclusion that the charges made by the Huntsville Clinic--60 percent of the amounts on the Huntsville Clinic fee schedule--serve as a useful benchmark. On the one hand, an X-ray laboratory in 401 Lowell Drive would be convenient for the physicians in this building, giving a hypothetical independent X-ray laboratory a competitive edge over the *131 Huntsville Clinic and so allowing it to charge more than the Huntsville Clinic. On the other hand, an independent X-ray laboratory would be expected to pay for its own rent, utilities, and insurance, rather than be subsidized in this respect by North Alabama. Based on the evidence in the record in the instant cases, we conclude that arm's-length charges for the X-ray services provided by Services to North Alabama in 1971 and 1972--net of reasonable charges that would have been made for rent, utilities, and insurance--are $10,000 (for 1971) and $11,000 (for 1972) less than what North Alabama paid to Services (see table 1, supra), or about 55 percent of the amounts that North Alabama charged to its patients. In order to clearly reflect the incomes of North Alabama and Services, it is necessary to allocate the $10,000 and $11,000 from Services to North Alabama. Petitioners argue that we should not make a partial allocation because respondent states that the "record supports little or no rational basis" for a partial allocation relying on our opinions in Your Host, Inc. v. Commissioner, 58 T.C. at 28 n. 4, and Davis v. Commissioner,supra. We understand this argument to be based on *132 the notion that the Court is precluded from finding a middle ground when each side argues only for its original position. Firstly, respondent has not quite put all his eggs in the one basket. Indeed, the issue we discuss at II.B. Ownership of Services,infra, arises because, at trial respondent presented the ownership question: If the Court should find or make an allocation under 482, less than the total receipts to the professional association [North Alabama] and find that the sub-chapter S [Services] did earn some of the income from the X-Ray Services, therefore, an allocation of less should be made to the X-Ray Services, respondent still contends that the individual petitioners are taxable to the extent of the distributable income of X-Ray Services, Inc. on the ground that under the test--or under the facts and the tests set forth in the regulations, under 1373, the physician members were in fact the true stockholders of the sub-chapter S corporation. A similar statement of position appears in respondent's opening brief. Secondly, the Court's decision to exercise its discretion and find a middle ground depends on the record in the case (or cases) before it. See Rudd v. Commissioner,79 T.C. 225, 238 n. 17 (1982). *133 Unlike the situation in Your Host and Davis, we believe there is a basis for a partial allocation in the record in the instant cases. In the instant cases, evidence was presented as to the income element, in particular the prices charged by Huntsville Clinic and others for similar services, and this income element is the major portion of any allocation. In contrast, in Davis we concluded that the prices charged by the subchapter S corporations were "comparable to those charged by other X-ray laboratories and physical therapists in the community" (64 T.C. at 1045) and the nonincome items as to which there might properly have been an allocation were relatively minimal (64 T.C. at 1047). Thirdly, when we analyze what an arm's-length charge would have been, we find that the result contended for by respondent is significantly closer to the mark than is the result contended for by petitioners. Under these circumstances, we decline petitioners' invitation to decide this issue entirely for them merely because they have persuaded us that there was some error in respondent's determination. Cf. Helvering v. Taylor,293 U.S. 507 (1935). We hold that respondent's adjustments to increase North *134 Alabama's taxable incomes (by $12,883.86 for 1971 and by $21,097.49 for 1972) are unreasonable, but only to the extent that they exceed increases in the amounts of $10,000 for 1971 and $11,000 for 1972, and that correlative adjustments are to be made to Services' taxable incomes for these years, for purposes of determining the income of Services' shareholders under issue II, infra.
II. DIVIDENDS AND CONSTRUCTIVE DIVIDENDS
Respondent contends that the amounts paid by Services to Bell's father, Plott's children, and Haws' children during the years in issue constitute constructive dividends to Bell, Plott, and Haws, as shareholders of North Alabama, to the extent any of Services' income is properly allocable to North Alabama. Respondent contends that, if we hold that any amounts of Services' income are not attributable to North Alabama, then the distributions to the extent of these amounts are taxable to Bell, Plott, and Haws, because they are the true owners of Services' stock. [29] Petitioners maintain that (1) Services' income is not properly allocable to North Alabama and thus there is no basis for finding a constructive dividend, and (2) Bell's father, Plott's children, and Haws' *135 children were the owners of Services' stock and properly reported any income from Services on their respective income tax returns for the years in issue. We agree with respondent, both as to the constructive dividends resulting from the section 482 allocations and as to the ownership of Services' stock. [30] *136 A. Constructive Dividend Resulting from Section 482 Allocation
Generally, distributions of property of a corporation with respect to its stock out of its earnings and profits are taxable to the shareholder receiving the distribution. Sections 61, 301(a), 301(c), and 316(a). However, a shareholder will be taxed on dividend income even though the shareholder did not receive any actual distribution when funds are transferred from one corporation to another related corporation primarily for the person benefit of the common, controlling shareholder.[31] See Ross Glove Co. v. Commissioner,60 T.C. 569, 595 (1973). Intercorporate transfers which are altered by a section 482 allocation may fall within this category. Engineering Sales, Inc. v. United States,510 F.2d 565 (CA5 1975); Sparks Nugget, Inc. v. Commissioner,485 F.2d 631 (CA9 1972), affg. a Memorandum Opinion of this Court. [32] In particular, the shifting of funds between corporations for the purpose of directing income to children of the common, controlling shareholder provides a direct, personal *137 benefit to the shareholder, which gives rise to constructive dividend treatment. Engineering Sales, Inc. v. United States,510 F.2d at 570. In the instant cases, Bell, Plott, and Haws testified that they established Services and gave Services' stock to their designated relatives in order to provide income for these relatives. The establishment of the rate of the fees paid to Services by North Alabama was directly related to this purpose. The greater the payments by North Alabama to Services, the greater the amounts that could be given to the designated relatives without appearing to go through Bell's, Plott's, and Haws' hands and (but for the instant cases) without being includible in Bell's, Plott's, and Haws' taxable incomes. In the instant cases, there is no evidence that would diminish the importance of this personal, diversionary purpose and sought-for benefit, by indicating that the excessive payments (i.e., the payments by North Alabama *138 as to which we have sustained respondent's sec. 482 allocation) had any business purpose at all. See Engineering Sales, Inc. v. United States,510 F.2d at 570; Sparks Nugget, Inc. v. Commissioner, 458 F.2d at 637-638; Sammons v. United States,433 F.2d 728, 732 (CA5 1970). Cf. Ross Glove Co. v. Commissioner,60 T.C. at 596. We conclude that the purpose of the intercorporate shift of funds involved here was primarily for the direct, personal benefit of the petitioners. Accordingly, we hold that Bell, Plott, and Haws each are taxable on one-third of the amounts of the section 482 allocation as constructive dividend income for the years 1971 and 1972 as shareholders of North Alabama. These amounts are then treated as contributions by Bell, Plott, and Haws to the capital of Services. See Sparks Nugget, Inc. v. Commissioner,supra.
B. Ownership of Services
"Transactions within a family group are subject to special scrutiny in order to determine if they are in economic reality what they appear to be on their face." Fitz Gibbon v. Commissioner,19 T.C. 78, 84 (1952). With respect to transfers of stock of an electing small business corporation, section 1.1373-1(a)(2), Income Tax Regs., *139 provides, in part, that: A donee or purchaser of stock in the corporation is not considered a shareholder unless such stock is acquired in a bona fide transaction and the donee or purchaser is the real owner of such stock. The circumstances, not only as of the time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides of the transfer. Transactions between members of a family will be closely scrutinized. The regulation makes it clear that, if a transaction between members of a family is not bona fide, then its effectiveness as an income-splitting device will be frustrated. Duarte v. Commissioner,44 T.C. 193, 197 (1965). In making the factual determination [33] of whether those children who received stock in an electing small business corporation beneficially owned such stock so as to be taxed on their distributive shares of the income of such corporation, the cases have applied the following four criteria, no one criterion being determinative: (1) are the transferees within the family able to exercise effectively ownership rights over their shares; (2) did the transferor continue to exercise *140 complete dominion and control over the transferred stock; (3) did the transferor continue to enjoy the economic benefits of ownership after conveyance of the stock; and (4) did the transferor deal at arm's length with the corporation involved. Speca v. Commissioner,630 F.2d 554, 556 (CA7 1980), affg. a Memorandum Opinion of this Court, [34] and the cases cited therein. After applying all four of these criteria to the circumstances of the instant cases, we conclude that the purported transfers of subscriptions to stock in Services to Bell's father, Plott's children, and Haws' children lacked economic reality and that Bell, Plott, and Haws remained the true owners of Services' stock. It is undisputed that a physician associating with North Alabama would be permitted to have his children become equal owners, on a per stirpes basis, of the X-ray business. Thus, Bell, Plott, and Haws retained the power to transfer the stock in Services which had purportedly been transferred to the designated relatives. Plott and Haws also exercised in 1972 the power to adjust the stock ownership among *141 their children. See Beirne v. Commissioner,52 T.C. 210, 218-219 (1969). Finally, Bell, Plott, and Haws retained the power to decide to liquidate and dissolve Services for the purpose of allowing Maccubbin's children to share in the income from the X-ray business when Maccubbin became a shareholder in North Alabama. [35] *142 Although the record includes many examples of Bell, Plott, and Haws exercising control over Services' operations, Services' stock ownership, and even Services' liquidation, the record includes no instance of any similar involvement by the formal shareholders, despite the adult status of Bell's father, the oldest of Haws' children, and Harriett R. Plott (in her role as custodian for Plott's children). See Speca v. Commissioner,630 F.2d at 557. From the foregoing, we conclude that Bell's father, Plott's children, and Haws' children were not able to exercise ownership rights over their stock in Services, but instead Bell, Plott, and Haws continued to exercise dominion and control over Services' stock (the first two criteria listed above). Bell, Plott, and Haws enjoyed the economic benefits associated with Services' stock, under the principles enunciated in Helvering v. Horst,311 U.S. 112 (1940). Basically, all that Bell's father, Plott's children, and Haws' children received as a result of the purported transfers were "interests" in Services' income. Bell, Plott, and Haws retained the right to change *143 these income "interest". See table 2, supra. Bell, Plott, and Haws procured, by virtue of the purported transfers, the payment of Services' income, as valuable gifts to their designated relatives, [36] while at the same time retaining dominion and control over the stock. Helvering v. Horst,supra.Accordingly, the fact that the distributions with respect to Services' stock were paid to Bell's father or deposited in the respective bank accounts of Plott's children and Haws' children does not persuade us that Bell, Plott, and Haws did not enjoy the economic benefits of Services' stock. The receipts of Services' distributions by their designated relatives constituted valuable gifts from Bell, Plott, and Haws. Thus, the third criterion points toward a lack of economic reality to the purported transfers. In view of our conclusion that North Alabama and Services did not deal at arm's length (see I.C. Section 482,supra), Bell, Plott, and Haws, the sole shareholders of North Alabama during the period Services was in existence, cannot *144 be said to have dealt at arm's length with Services. Thus, the fourth criterion also points toward a lack of economic reality. Based on the foregoing, we conclude that Bell, Plott, and Haws were the true owners of Services' stock during the years in issue. It follows, therefore, that Bell, Plott, and Haws are taxable on the distributions made by Services during 1971 and 1972, to the extent of Services' earnings and profits for these years, after taking into account the section 482 adjustments determined herein above. On this issue we hold for respondent (but see n. 30, supra). III. Demolition Loss
Petitioners maintain that they are entitled to deduct a loss on the demolition of the Huckaby building because (1) the Huckaby building was purchased with the intention of remodeling and expanding it for use as a medical office building by North Alabama, and (2) this intention did not change until three or four months after the purchase of the Huckaby building. Respondent asserts that the Huckaby building was purchased with the intention of demolishing it and thus, no demolition loss deduction is allowable.[37] *145 We agree with petitioners. Generally, under section 165 [38] an individual may deduct any uncompensated business loss, but not in excess of his or her basis (plus, in a demolition case, the cost of demolition). Sections 1.165-3(a)(1) and 1.165-3(b)(1), Income Tax Regs., [39] *147 provide in substance that if real property is acquired (in the course of business or in a transaction entered into for profit) with the intention of demolishing the building situated thereon no deduction shall be allowed on account of the demolition. However, if no such intent exists at the time of acquisition, but is formed subsequently, the loss incurred at the time of demolition *146 will be deductible to the extent of the building's adjusted basis plus cost of demolition. Intention of demolishing is a matter of fact ( Nash v. Commissioner,60 T.C. 503, 513 (1973); Canelo v. Commissioner,53 T.C. 217, 227 (1969), affd. 447 F.2d 484 (CA9 1971); *148 sec. 1.165-3(c)(1), Income Tax Regs.), as to which respondent's determinations in the notices of deficiency are presumed to be correct. Welch v. Helvering,290 U.S. at 115. Section 1.165-3(c), Income Tax Regs., [40] *149 *150 sets forth a number of factors to be considered in the determination of intent. Subparagraph (1) of this regulation points out that the determination "depends upon an examination of all the surrounding facts and circumstances". The following factors point toward a conclusion that, when Properties acquired the Huckaby building, it did not then intend to demolish the Huckaby building: (1) There was a delay of about 22 months between the date of acquisition and the date of demolition. (2) Evidence of prohibitive remodeling costs was not determined until Bell and Plott met with an architect several months after the purchase date. (3) It was not until after Properties acquired the Huckaby building that Bell, Plott, and Haws learned that a zoning ordinance prohibited any alteration of the Huckaby *151 building; this ordinance did not prohibit the continued use of the building for medical offices. (4) The parcel on which the Huckaby building was located was not used for the new office building for North Alabama, nor was it used for parking for the new building. Respondent points to the following factors as leading to a conclusion that the intention to demolish was present when the Huckaby building was acquired: (1) It should have been obvious to Bell, Plott, and Haws that remodeling costs would be prohibitive. The failure of the three physicians to inquire about such costs in advance suggests that they were more concerned about acquiring the land than about acquiring the Huckaby building. [41]
(2) Haws, with his longstanding interest in such matters, could be expected to have been aware of the zoning ordinance which in effect prevented substantial alterations to the Huckaby building. Also, one would have expected that the attorney that prepared the limited partnership documents for Properties would have advised the partners of the *152 existence and likely impact of the ordinance.[42]
(3) The Huckaby building, as it stood at the time of acquisition, was too small to serve North Alabama's needs; it had about 20 percent less floor area than North Alabama's facilities at 401 Lowell Drive. The building that was ultimately built for North Alabama, in contrast, had about 50 percent more floor area than North Alabama's facilities at 401 Lowell Drive. [43]
No one of the foregoing factors is controlling. Based on the record as a whole, we conclude that petitioners have borne their burden of proving that there was not an intention of demolishing the Huckaby building at the time of its purchase and thus petitioners are entitled to a loss deduction. [44] *153 We hold for petitioners on this issue. To reflect the foregoing and the parties' settlement of other issues, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Dwight M. Plott and Harriett R. Plott, docket No. 5007-76; Frank P. Haws and Linda B. Haws, docket No. 5010-76; and North Alabama Neurological, P.A., docket No. 5019-76.↩
2. Unless indicated otherwise, all section, subchapter, and chapter references are to sections, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
3. On January 21, 1974, Don A. Maccubbin (hereinafter referred to as "Maccubbin") became an equal member of North Alabama upon the payment of $5,000. In January 1975, Lynn B. Boyer (hereinafter referred to as "Boyer") became an equal member of North Alabama upon the payment of $5,000. ↩
4. At the time of the trial, Bell was no longer practicing with North Alabama.↩
5. On January 28, 1969, an invoice was issued by X-Ray Service and Sales Company (hereinafter referred to as "Sales") to "Dr. Frank P. Hawes" for X-ray equipment "listed on our quotation dated 10-16-68" at a price of $19,928. A statement confirming this balance was sent to "Dr. Frank P. Hawes" on January 31, 1969. The invoice of January 28, 1969, separated the $19,928 total price into 70 percent ($13,949.60) "Payable at Present time" and 30 percent ($5,978.40) "Payable on Completion". ↩
6. Stipulated exhibits indicate that on February 17, 1969, the Bank lent a net of $5,978.40 to Services, which the Bank disbursed by way of a cashier's check, dated February 17, 1969, payable to Sales, with Services shown as the remitter. On March 21, 1969, the Bank lent a net of $23,034.87 to Services. Part of this amount was used in part to pay the February 17, 1969, loan, and the remainder was deposited into Services' checking account. On March 27, 1969, $13,949.60 was charged to this account. The total of the $5,978.40 February 17, 1969, cashier's check and the $13,949.60 March 27, 1969, charge equals the $19,928 cost of the X-ray equipment. The parties do not favor us with any reconciliation of (a) Services' role in the February 17, 1969, transactions, (b) their stipulation that Services was incorporated on March 5, 1969, and (c) their stipulation that, after↩ Services' incorporation, Bell, Plott, and Haws arranged a loan from the Bank in the amount of $19,928, the proceeds of which were used to purchase the X-ray equipment.
7. In a few instances, the column in which the fee was recorded was left blank or contained the notation "N/C".↩
8. Bell, Plott, and Haws also served as officers of Services.↩
9. Shares of stock in Services issued to Plott's children were issued in the name of petitioner Harriett Ramsey Plott, as custodian under the Alabama Uniform Gifts to Minors Act; shares issued to Haws' children were issued in the name of Haws, as custodian under the Alabama Uniform Gifts to Minors Act.↩
10. Also on January 24, 1972, shareholder consents were filed on behalf of William and Meredith so as to continue subchapter S status for Services. (See n. 22, infra.↩)
11. Under the law then in effect, a corporation was not permitted to continue its subchapter S status if it had more than ten shareholders.
4. The 6's and 3's in the hundredths column are as they appear on the 1975 tax return; it is evident that these numerals should be zeroes.↩
1. Children of Maccubbin (see note 3, supra↩). 2. Children of Boyer (see note 3, supra↩). 3. Items do not add up to 100, because of rounding. 12. Properties' partnership agreement refers to these partners as "limited partners", but the certificate of limited partnership, the amended certificate of limited partnership, and the parties' stipulation refer to them as "special partners". We do not understand that a "special partner" was different from what is generally understood as being a limited partner, for any purpose relevant to these cases. ↩
13. B. L. Bercaw practiced with North Alabama for about one year, ending August 6, 1971.↩
14. The parties have stipulated that this acquisition was of "a tract of improved real estate located at 901 Madison Street". The testimony, a stipulated plat, and the parties' requested findings of fact make it clear that two parcels were acquired and that they were separated as indicated in the text. The Court concludes that justice requires us to disregard this stipulation to the extent indicated. Rule 91(e). Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
15. Harris and Rands Alley has since been renamed Rand Avenue.
16. Huckaby's patients and employees were permitted to park at the rear of the service station across the alley from the Huckaby building, but Bell, Plott, and Haws were told that such a parking arrangement would not be available to them.↩
17. June 1972 was the last month Properties received the $600 lease payment from Huckaby.↩
18. To some extent, the layout of North Alabama's leased facilities was inefficient because North Alabama had expanded by tacking on additional space as it became available.↩
19. These payments were made by Properties beginning in December 1971; the last payment was in November 1972.↩
20. The unimproved tract abutting the Toliver parcel (that Properties had acquired from Huckaby) was also improved so it could be used for parking.
21. Of the $100,000 purchase price for the two Huckaby tracts, Properties allocated $75,000 to the Huckaby building. Properties claimed a deduction for depreciation on the Huckaby building in the amount of $3,125 on its 1971 partnership tax return. Thus, Properties' adjusted basis was $71,875 at the beginning of 1972.↩
22. The parties have stipulated that, on April 3, 1969, Services "made a valid election to be taxed as a small business corporation under the provisions of Subchapter S of the Internal Revenue Code." They have also stipulated that, on January 24, 1972, "appropriate consents to an election under section 1372(a) of the Internal Revenue Code were filed with the Internal Revenue Service by Harriett Ramsey Plott as custodian of the Plott children and by Dr. Haws as custodian of the Haws children," on account of the addition of William and Meredith as shareholders of Services. We consider these stipulations to constitute an agreement by the parties that, if Services is to be recognized for tax purposes as a separate corporation, then it is to be treated as having been a subchapter S corporation from its inception through the years in issue. We do not consider these stipulations to constitute a concession by respondent that Services should be recognized for tax purposes as a separate corporation or that Bell's father, Plott's children, and Haws' children should be treated as the real owners of Services' stock. See sec. 1.1373-1(a)(2), Income Tax Regs.↩
23. It is evident that Bell, Plott, and Haws sought to reduce their families' aggregate tax liabilities by the use of Services (and its successor limited partnership). They sought to do this with as little practical change in their operations and control as they could get away with. Our task, in this Part and in Part II of this opinion, is to determine how well they hewed to the line separating sham from reality. In analyzing this in terms of "reality", we note that, in a sense, North Alabama was as unreal as Services, in that both corporations owed their "existence" to pieces of paper, and that both "acted" only through their employees and directors. Yet, all of the parties herein affirm the reality of North Alabama, even as respondent disputes the reality of Services.
24. The test to be applied is the same, regardless of which side takes which position; however, the outcome of a given case may well be affected by who has the burden of proof, including the burden of persuasion. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
25. In view of this conclusion, we need not resolve whether the various purposes for the formation of Services (i.e., to limit liability, to make North Alabama's practice more efficient, and to allow Bell's father, Plott's children, and Haws' children to share in the income from X-rays) constitute the equivalent of a business activity. See Achiro v. Commissioner,77 T.C. 881, 901↩ n. 25 (1981).
26. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. [The subsequent amendment of this provision by section 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant cases.] ↩
27. Petitioners concede that Services and North Alabama were controlled by the same interests during the years in issue.↩
28. These are the approximate percentages that would result from dividing (a) North Alabama's charges to its patients (computed as Services' actual charges to North Alabama, divided by 85 percent) into (b) charges equal to Services' expenses.
29. In their reply brief, petitioners assert that respondent is required to assume the burden of proof with respect to this alternative position because this position is inconsistent with the dividend income adjustments made in the notices of deficiency issued to Bell, Plott, and Haws and the evidence required to disprove respondent's alternative position differs from evidence which would disprove a determination of dividend income. Petitioners do not assert that they were surprised or prejudiced at trial by respondent's assertion of this alternative argument. We are convinced that the evidence in the record clearly indicates that Bell, Plott, and Haws were the true owners of Services' stock and, so we do not base our decision on this issue on the burden of proof.↩
30. In the Rule 155 computation, the total additional dividend income is the lesser of (1) the amount determined in the notices of deficiency and (2) the sums of the amounts resulting from the analysis under the section 482↩ and stock ownership issues.
31. Bell, Plott, and Haws were the true shareholders of Services (see discussion in B. Ownership of Services,infra), and so were common, controlling shareholders of both North Alabama and Services. See also n. 27, supra.↩
32. T.C. Memo. 1970-74↩.
33. Wilson v. Commissioner,560 F.2d 687, 690 (CA5 1977), affg. T.C. Memo. 1975-92↩. 34. T.C. Memo. 1979-120↩.
35. There was some vague testimony that Maccubbin's children in 1974 and Boyer's children in 1975 paid for the interests they acquired in X-ray Services, Ltd., the limited partnership. However, (1) it is not clear whether Haws and Plott, who so testified, were thinking of the payments that Maccubbin and Boyer made for their interests in North Alabama (see n. 3, supra↩), and (2) the testimony gives no indication as to the amounts paid. At most, the suggestion was that Maccubbin's children and Boyer's children paid pro rata shares of the book values of X-Ray Services, Ltd.'s assets. From the meager information in the record in the instant cases, it seems to be more likely than not that any such capital investments by Maccubbin's children and Boyer's children were less than their shares of one year's apparent profits from the X-ray business. In sum, we believe that any such investments by Maccubbin's children and Boyer's children were nominal at most.
36. We have no gift tax determinations before us in the instant cases and we make no holding as to whether these transfers constitute "gifts" for gift tax purposes.↩
37. Respondent states on brief that "[a]lthough the evidence of record indicates that the partnership has made an improper allocation between the land and the building if the partnership did not intend to demolish the building, respondent does not dispute the amount claimed as a demolition loss provided the partnership is entitled to a deduction for such loss." Respondent does not offer an explanation for this simultaneous contention and contrary concession. We will operate on the basis of the concession and ignore the contention. Cf. Canelo v. Commissioner,53 T.C. 217, 227-230 (1969), affd. 447 F.2d 484↩ (CA9 1971).
38. Section 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1001 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; ↩
39. SEC. 1.165-3. DEMOLITION OF BUILDINGS. (a) Intent to demolish formed at time of purchase. (1) Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of sec. 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. (b) Intent to demolish formed subsequent to the time of acquisition.↩ (1) Except as provided in subparagraph (2) of this paragraph [relating to the demolition of a building by a lessee or lessor], the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition.
40. (c) Evidence of intention.--(1) Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom.
(2) An intention at the time of acquisition to demolish may be suggested by: (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings. (3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prlonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition. (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by municipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property.↩
41. This is essentially speculation. There is no indication in the record as to what would have been obvious to a physician regarding remodeling costs.↩
42. This is essentially speculation.There is no indication in the record that the attorney was expected to advise as to the suitability of particular purchases then contemplated.↩
43. We note that a second story built on top of the Huckaby building might have resulted in the remodeled Huckaby building providing about as much floor area as the building that was ultimately built for North Alabama.↩
44. On brief, respondent points out that Herrin and Huckaby, whose testimony provided some corroboration of Bell's, Plott's, and Haws' testimony, were respondent's witnesses. Respondent asks "[w]here were the petitioners' witnesses which [sic] would corroborate any serious intention on this point to renovate the Huckaby building?" Our holdings are based on the record as a whole; any party may use the testimony of all the witnesses--not just those called by that party--in making that party's case.